THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* THE F. H. SMITH COMPANY and Others, Appellants.*

Fourth Department, July 1, 1930.

---

* Modf. 136 Misc. 449.

*Frank G. Raichle*, for the appellants.

*Hamilton Ward, Attorney-General* [*Leonard R. Lipowicz* of counsel], for the respondent.

EDGCOMB, J. This action is brought under the Martin Act (Gen. Bus. Law, art. 23-A added by Laws of 1921, chap. 649, as amd.) to restrain the defendants from selling or disposing of certain bonds issued by the defendant Fairfax Apartment Corporation of Buffalo, and for the appointment of a receiver of the defendants F. H. Smith Company and the Fairfax Apartment Corporation of Buffalo. Judgment has been awarded the plaintiff for the relief sought.

Section 353 of the General Business Law authorizes the Attorney-General to bring an action in the name of the People of the State New York against any person or corporation, whom he believes has employed or is about to employ any device, scheme or artifice to defraud the public in the sale or distribution of stocks, bonds or other securities, to enjoin the continuance of such fraudulent practice.

The statute is remedial in its nature, and was passed to protect the inexperienced, confiding and credulous investor, and save him from his own foolish cupidity. It should, therefore, be liberally and sympathetically construed in order that its beneficent purpose may, so far as possible, be attained. (*Allen* v. *Stevens*, 161 N. Y. 122, 143; *Hudler* v. *Golden*, 36 id. 446.)

This statute was before the Court of Appeals in *People* v. *Federated Radio Corporation* (244 N. Y. 33), and it was there held that it should be given such a broad construction as would put an end to all visionary and fantastic schemes of promoters in the sale and disposition of securities, whereby the public would be fraudulently exploited, so far as that might be done. The words " fraud " and " fraudulent practice " were construed to include all acts which tended to deceive or mislead the purchasing public, even if such acts were done without any actual design to perpetrate fraud or

injury upon others. It was said that fraud, as used in the statute, included "all deceitful practices contrary to the plain rules of common honesty."

Read in the light of the above rules, the evidence shows that the defendants employed a device or artifice, in connection with the sale of the securities in question, which tended to ensnare and deceive the public.

In 1926 the Pemberton Building Company built an apartment house, known as Cleveland Hall, on Delaware avenue in the city of Buffalo, N. Y. The structure was ten stories in height, and contained 157 apartments. The building was financed by an issue of first mortgage seven per cent gold coupon bonds of the total par value of $1,200,000. This issue was underwritten by the defendant F. H. Smith Company, Inc., a bond and investment house in Washington, D. C. In the early part of 1929 the property was purchased by the Fairfax Apartment Corporation of Buffalo, N. Y., of which the defendant Henry C. Maddux was president. The new owner decided to convert the building into an apartment hotel. To do so, it was necessary to redecorate and furnish the rooms, take out the kitchenettes, and convert them into bedrooms. This required additional capital. Forty thousand dollars par value of the bonds secured by the above-mentioned mortgage fell due May 15, 1929. All this meant a refinancing, and the owner turned for aid to the F. H. Smith Company, which had financed similar projects in other cities for Mr. Maddux. The result was the execution by the defendant Fairfax Apartment Corporation of a first and refunding mortgage upon this property, as security for an issue of $1,550,000 six and one-half per cent gold coupon bonds. As none of the bonds secured by the underlying mortgage had been paid, the new deed of trust provided that $1,200,000 par value of the bonds authorized to be issued thereunder should be signed and sealed by the company and delivered to the trustee, and held and released only as an equal amount in principal of the underlying obligation was redeemed and canceled. This left bonds of the par value of $350,000 available for the alteration of the building and the cost of refinancing. The entire issue of new bonds was underwritten by the defendant F. H. Smith Company, and was offered for sale to the public by that company. It is these securities which the defendants have been enjoined from selling.

The fraud, if any, which was practiced by the defendants in the sale of these obligations was the circulation and use of a prospectus which set forth the particulars of the bonds and the security pledged for their payment.

Upon the first page, under the heading "Appraisals," we find the following:

" The property has been appraised by:

" J. R. Ingham & Co., Inc., Realtors, Buffalo, N. Y. . . . . $2,250,000

" Philip M. Jullien, an experienced architect of Washington, D. C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,245,000 "

The property was appraised as a " going apartment hotel," upon the basis of prospective earnings. That is so stated in a letter to the Fairfax Hotel Corporation from each of said appraisers, which letter is published in full in the prospectus. Mr. Ingham was sworn, and testified that he made the appraisal " on the basis of earnings of a going apartment hotel," and that " the physical value did not enter into the case." Appellants insist that this is a suitable and appropriate method of determining the value of property which is pledged as security for an issue of bonds.

A bondholder is in a position far different from that of a stockholder. The former is a creditor, while the latter is a part owner of the corporation. A bondholder buys as an investment, not as a speculation, and seeks a security which embodies freedom from danger and hazard, as well as a definite assurance of income for a given period. Safety is the first consideration, and in order to gain that most desired quality, the conservative investor is willing to sacrifice the enhancement in value of his security, which so often follows the rise in stock of a successfully run concern. A bondholder has a right to assume that his risk is small, and that he will not be called upon to share in the losses of the business. His position is supposed to be unusually secure, because he has a lien, prior to all other indebtedness, upon the physical property of the obligor and which can be sold to pay the obligation, if there is a default. Of course, perfectly safe investments do not exist. There is always some degree of risk. Safety is a relative term. A bond is supposed to be as safe an investment as one can make. Its worth, however, depends upon what is back of it. If the value of the property pledged as security is less than the total amount of the bond issue, the securities are not worth their face value, unless the mortgagor is financially responsible, and can be made to pay upon his primary obligation. So careful is the law to protect securities in which savings banks can invest, that a mortgage given to secure a bond must be on unincumbered real property situate in this State, and the loan cannot exceed sixty per cent of the appraised value of the property. (Banking Law, § 239, subd. 6, as amd. by Laws of 1927, chap. 323.) A like provision applies to the investments which may be made by a trustee. (Pers. Prop. Law, § 21, as amd. by Laws of 1928, chap. 362.)

I know of no exact yardstick by which to determine the value of property pledged as security for a loan. After all is said and done, value is what a willing purchaser will give for the property under fair

market conditions. (*City of New York* v. *Sage*, 239 U. S. 57; *Fox* v. *Phelps*, 17 Wend. 393, 399.) In determining that amount many things must be taken into consideration, and given such weight as is proper under the circumstances. When one considers the nature and purpose of a loan, he is forced to the conclusion that the valuation of the security should be based on physical, tangible property, and not on some unsubstantial, fanciful or ephemeral intangible. Potential profits in the hotel business are most uncertain, and the minute they are made the basis of a loan, the investor jumps from the realm of investment to that of speculation. Of course, it is proper, in fixing the value of real property, to take into consideration to some extent its earning power. The receipts from a thousand room, modern hotel building located in a village of five hundred inhabitants would be practically nothing, and the value of the property would be very little as compared with a similar building located in the heart of the hotel district in New York city. So value, to a certain extent, is proportionate to the earning power of the property. But all this gets back to the law of supply and demand. While an investment is ordinarily safe as long as the interest and installments of principal are promptly paid, and while ability and willingness to pay depend to some extent upon the earning capacity of the debtor, nevertheless, if the physical property back of the loan is insufficient to take care of it, the venture could hardly be recommended as a conservative investment, no matter what the potential earnings of the property might be.

I think that an appraisal of property which is pledged as security for a loan should be based on the price which the property will command in the market. Ordinarily, the value of the land can easily be determined from other sales. The actual cost of the construction of the building, less depreciation for age, is usually a satisfactory method of determining the value of the building. Undoubtedly, it would be proper, and in some cases advisable, to check this valuation against prospective rentals of the property, capitalized at a fair rate for similar properties. But, standing alone, the latter appraisal is not a proper basis for a conservative loan.

So we start with an erroneous method of determining the value of the property which was pledged for the payment of this issue of bonds, and which tends to divert the attention of the ordinary buyer from the true state of facts. That is especially true because of the statement in the beginning of the first prospectus that the appraisal had been made by a realtor and an architect. The average person would naturally think that an appraisal would be made from the standpoint of the appraiser's business. One would hardly think that a real estate broker or an architect would be so familiar

with the hotel business that he would be able to fix the value of real property used for that purpose on the basis of probable earnings.

In this connection attention should be called to the fact that, after the prospectus was issued, Mr. Ingham wrote to the F. H. Smith Company, protesting against the use of his appraisal, because it was misleading, due to the fact that it had been made solely upon the basis of prospective profits. Thereafter, a second circular was issued, in which the statement relating to the appraisals as contained in the first part of the prospectus was omitted, and in place thereof was inserted: " Valuation appraisals of the Fairfax of Buffalo are set forth within." The letter of the Ingham Company, giving the details of its appraisal, appeared in the second circular the same as in the first.

If we are to take the physical property as the basis of its value, the evidence shows the appraisals to be grossly excessive and exorbitant.

Even upon the basis of valuation which was adopted by the defendants, it is apparent that the appraisals were inflated beyond all reason, and were deceptive and misleading. Of course, when one estimates the future earnings of any business, it is merely his opinion, and one could not be indicted for perjury if his guess was larger than it should have been. However, if we are to apply to this estimate the actual earnings of the business while it has been in operation, as we have a right to do, it is apparent that actual performance has fallen far short of the prophesy. A balance sheet taken from the books of the Fairfax Apartment Hotel Corporation as of October 1, 1929, shows an operating loss of $53,141.17 for eleven months of operation.

The defendants claim that the earnings up to the time of the trial were not a proper index of the future, because the business was seriously interfered with by the instigation of these proceedings, and by the changes made necessary in adapting the property for use as an apartment hotel. We are also told that a hotel business does not usually hit its stride until the third year. But here the evidence shows that the hotel is catering to the theatrical trade, and that does not ordinarily indicate great prosperity, or augur especially well for the future. In view of the experience of the past, I think that the conclusion is inevitable that the prophesy as to the prospective earnings was altogether too sanguine.

So from whatever standpoint the appraisers approached their task, they evidently used a powerful microscope when they fixed the value of this property at $2,250,000.

A conservative investor will demand that there be an adequate margin of safety between the amount of the loan and the value of the property. On the basis of the property being actually worth

$2,250,000, the margin of safety is less than one and one-half to one, which any conservative banker or investor knows is not sufficient. The experienced buyer, one acquainted with the value of securities, and who was accustomed to analyze prospecti, balance sheets, etc., might not be misled by this circular, and if he bought any of these securities, it might be said that he purchased them at his peril. But with the average buyer, and the casual investor — the school teacher, the widow, the housewife, the clerk, or the professional man — the result would be different. The Legislature had such persons in mind when it passed the Martin Act, and to them the information in the prospectus would be misleading and deceptive.

This record presents a picture, as I view it, of an attempt on the part of these promoters to float a project which, undoubtedly, they hoped and probably believed would eventually be successful, by selling to the public a bond issue large enough to pay for the entire property, and without putting any of their own money in the enterprise. Under such circumstances, they have quite naturally put their best foot forward. But in so doing, they have inflated and exaggerated the value of the security out of all proportion, in the hope that the unsuspecting and long suffering public will be induced to buy the bonds, and put up the requisite money. If the fondest dreams of the promoters are realized, then the interest will be met, and the bonds eventually taken care of; if their hopes do not materialize, the loss will fall, not upon them, but on the bondholders. This was one of the situations which the Legislature had in mind when it passed the Martin Act, and one which it was sought to make impossible.

For the reasons above stated, I think that this prospectus tended to deceive the public, and that the evidence warrants a finding that the defendants, in their attempt to dispose of these bonds, employed a device or artifice which tended to defraud the public, and that an injunction should issue restraining the continuance of such fraudulent practice, and the further sale and disposal of these bonds.

This brings us to a consideration of the question of whether the court was justified in appointing a receiver of the defendant corporations.

A court of equity has no inherent or common-law jurisdiction to appoint a receiver of a corporation. Its power to so do is regulated solely by statute. (*Matter of Binghamton G. E. Co.*, 143 N. Y. 261; *Decker* v. *Gardner*, 124 id. 334.)

We must turn to section 353-a of the General Business Law (added by Laws of 1925, chap. 239, as amd. by Laws of 1926, chap. 617) for any authority which authorizes the appointment of a receiver in this action. That section provides that, in an action of

this character, the court may, at any stage of the proceeding, " appoint a receiver *of any and all property derived by the defendant or defendants or any of them by means of any such fraudulent practices, including also all property with which such property has been mingled* if such property cannot be identified in kind because of such commingling, together with any or all books of account and papers relating to the same." (Italics mine.)

Here the court has appointed receivers of the corporations, and not of any property which they have. There is a clear distinction between a receiver of the assets of a corporation, and a receiver of the corporation itself. (*Reusens* v. *Manufacturing and Selling Co.*, 99 App. Div. 214, 216.) Clearly the court exceeded its authority in appointing a receiver of either corporation.

Neither do I think that the plaintiff has made out a case for the appointment of a receiver of any property of either the Smith Company or the Fairfax Hotel Corporation. Such a limited receivership should not be ordered unless it will serve some beneficial purpose. The burden is always on the applicant to show its necessity. Courts are reluctant to resort to the summary remedy of a receivership, unless the proof clearly warrants such procedure. As was said by Judge VANN in *Mabon* v. *Ongley El. Co.* (156 N. Y. 196, 202): " Courts do not appoint receivers merely for the asking, but only on facts, alleged and proved, showing that one is necessary for the preservation of property, or to accomplish some other useful object."

As I view this situation, a receivership will work serious injury to the defendant corporations, and do the purchasers of these bonds no particular good. There are no general creditors whose interests must be conserved, and we are only concerned with the holders of the bonds which have been sold.

The evidence as to how many of these securities have been disposed of its rather meager. Mr. Meaker, a bond salesman, testified that he had sold bonds aggregating in value about $3,500. I find no other evidence of sales. The second prospectus issued by the defendant Smith Company contains a statement that since the first and refunding bond issue had been offered for sale, the underlying issue had been reduced to $673,300. This would indicate that $526,700 par value of the refunding bonds had been issued and delivered to the holders of a like amount of the underlying issue, and were outstanding.

The holders of these outstanding bonds are not general creditors. Their obligations are secured by real property which is situated in this State, and which cannot get away, and I fail to see how the bondholders are protected to any greater degree by turning this property over to a receiver, than by leaving it in the hands of the

trustee. On the contrary, if a receiver takes over the property, and attempts to run the hotel, or close it out, the value of the security will be materially decreased. The only hope which these bondholders have to realize a hundred cents on the dollar on their investment is to keep the hotel going under the best management possible, in the hope that it will be made a paying venture. The evidence shows that the present managers are competent and capable hotel men, and that the property is being run as efficiently as can be expected.

I think that if these defendants are enjoined from selling any more of these securities, it will, so far as possible, rectify the evil which was brought about by the use of this fraudulent prospectus, and will protect those who have already purchased these bonds as well as they can be protected, and is all the relief to which the people are entitled on the record before us.

All concur. Present — SEARS, P. J., CROUCH, EDGCOMB, THOMPSON and CROSBY, JJ.

Judgment modified on the law and facts, by striking therefrom all provisions for the appointment of receivers of the defendant corporations F. H. Smith Company, Incorporated, and The Fairfax Apartment Corporation of Buffalo, and all authority granted or instructions given to said receivers, and as so modified affirmed, without costs of this appeal to any party.

Certain findings of fact and conclusions of law disapproved and reversed.