Cooke, J.
We are concerned, on these cross appeals, with remedies. This action was instituted by the Attorney-General under the Martin Act, set forth in article 23-A of the General Business Law, and under subdivision 12 of section 63 of the Executive Law, principally for injunctive and other relief against promoters of a concededly illegal scheme for the cooperative conversion of a rent-stabilized apartment house in New York City.
The building, situate at 150 East 61st Street in a fashionable "East Side” area of Manhattan, contains 131 apartments, exclusive of that of the superintendent. Having been completed in 1961, it was subject to control of rent increases and evictions under the Rent Stabilization Law (Administrative Code of the City of New York, § YY51-3.0), but, once owned as a co-operative, said law would no longer be applicable. On July 18, 1969, defendant Lexington Sixty-First Associates, a New York limited partnership whose general partners are defendants Bresciani and Denihan, acquired an option to *592 purchase leasehold interests in the property, not the fee, subject to first and second leasehold mortgages.
On December 30, 1970, Lexington, as sponsor, filed with the Attorney-General, pursuant to section 352-e of the General Business Law, a plan for the conversion of 150 East 61st Street into a co-operative, offering shares of 150 East Tenants Corp., the co-operative corporation, to the tenants and others. The purchase price was listed at $8,826,105 and the profit to the sponsor was estimated at $3,157,075. The plan indicated that approximately 125 tenants in the building then held apartments pursuant to written leases and that since April, 1970 the property was managed by Manhattan East Apt./ Hotels, the principals of which were also Bresciani and Denihan.
The offering plan, promulgated purportedly in accord with the "Rent Stabilization Law of 1969 and the Code of the Rent Stabilization Association” (see Administrative Code, § YY516.0, subd c, par [6], cl [a]), stated it would not be declared effective ancf1 would be abandoned by the sponsor unless, within 18 months from the date of presentation thereof, 35% of the tenants in occupancy would have signed purchase agreements to acquire shares allocated to apartments without discriminatory repurchase agreements or other discriminatory inducements. Annexed thereto and made a part thereof was a copy of section 61 of the Code of the Rent Stabilization Association of New York City, Inc., which embraces a similar provision. A second amendment to the plan, dated June 24, 1971, recited that 55 tenants, being more than 35% of those in occupancy, had executed purchase agreements and declared the plan effective. The closing between the sponsor and the cooperative corporation took place on August 2, 1971.
Following an investigation, which revealed an elaborate course of conduct, starting months before the plan was filed and conceived with the obviously fraudulent design of meeting the 35% requirement, the Attorney-General commenced this action, alleging five causes for violations of the Martin Act, together with one pursuant to subdivision 12 of section 63 of the Executive Law, and praying for various forms of remedy. Special Term deemed plaintiff’s motion for a temporary injunction and related relief as one seeking summary judgment and gave the parties an opportunity to submit additional papers.
*593 Special Term, in granting summary judgment to plaintiff, succinctly observed:
"The material facts are not seriously disputed. Defendants engaged in conduct which they concede was illegal, but which they protest was the result of ignorance rather than fraud. They Teased’ vacant apartments in the building to various relatives, friends and business associates. These 'tenants’— who never in fact lived in the building—then agreed to purchase their apartments, under an arrangement with defendants that they would participate in profits from the resale of their apartments, but that losses would be absorbed by defendants. Defendants counted these 'purchasers’ as purchasing tenants in purported compliance with the requirement that 35% of the tenants in occupancy agree to purchase their apartments, so that defendants could declare the cooperative plan effective. Defendants thereupon did declare the plan effective, and subsequently obtained many more agreements to purchase from bona fide tenants.
"Defendants’ assertion that they acted in good faith, and were unaware that discriminatory inducements were prohibited, fails to excuse their conduct. And, considering the substantial business experience of the sponsors, and the fact that they were assisted by an experienced sales agent, and eminent counsel, their protestations of ignorance are wholly unpersuasive.
"No more meritorious is defendants’ assertion that the plan is valid despite the fraud because, after declaring the plan effective, they obtained sufficient 'untainted’ agreements to purchase from bona fide tenants to meet the 35% requirement. These agreements can hardly be designated 'untainted’, since defendants obtained them at the very time they were misleading the tenants by incorrectly asserting that the plan already was effective.”
The order and judgment entered thereon provided: (1) that nonpurchasing tenants occupying the building, who had not agreed to vacate pursuant to a settlement of summary proceedings, shall continue to occupy their apartments as rent stabilized tenants; (2) that owners of shares in the co-operative who resided in the building before a declaration of effectiveness was filed and agreed to purchase shares after said declaration was filed shall be offered rescission; (3) that all owners of shares in the co-operative, including those purchasing tenants whose purchases were not rescinded as above provided, *594 shall remain owners of shares in the co-operative; (4) that no further sales of co-operative interests may be made until a new amendment °to the offering plan is filed, containing provisions for notifying tenants who vacated their apartments after the declaration of effectiveness of their right of first refusal of apartments which are vacant or become vacant, enabling such tenants to return as rent stabilized tenants; (5) that evictions sought of nonpurchasing tenants who did not sign stipulations of settlement of eviction proceedings be stayed; (6) that non-purchasing tenants who signed stipulations in settlement of eviction proceedings may apply to the Civil Court to vacate the stipulations and, if successful, shall continue to occupy their apartments as rent stabilized tenants; (7) that the individual defendants and others acting in association or combination with them who hold shares in the co-operative and are not in actual occupancy shall apply to the Rent Stabilization Association of the City of New York for membership and, if admitted, pay all necessary fees and dues to said association for the purpose of administering and enforcing the Rent Stabilization Law and Code with regard to apartments placed under rent stabilization under the judgment and, in the event said defendants are not accepted by said association, all apartments so owned but not occupied by those shareholders be deemed to be housing accommodations subject to control under the provisions of title Y of the Administrative Code; (8) that defendant sponsors are enjoined from directly or indirectly engaging in or sponsoring further co-operative or condominium offerings for five years, but after two years may move for suspension of the remaining period; (9) that fines be imposed upon defendants in the amount of $2,000 each.
On appeal, the Appellate Division, in the exercise of discretion and the interest of justice, modified the Supreme Court order and judgment' by directing: (1) that all stipulations signed by nonpurchasing tenants in settlement of eviction proceedings be vacated and enforcement thereof be permanently enjoined; (2) that all current shareholders be offered rescission for a stated period; (3) that the apartments of all nonpurchasing tenants and of all shareholders shall become subject to the Rent Stabilization Law; and (4) that tenants who vacated their apartments after the declaration of effectiveness of the offering plan be deemed to have abandoned their claim so as not to have the right to return to tenancy as rent stabilized tenants.
*595 Article 23-A of the General Business Law is remedial in nature and should be liberally construed in order that its beneficent purpose may, so far as possible, be attained (People v Smith Co., 230 App Div 268, 269). The purpose of the law is to prevent all kinds of fraud in connection with the sale of securities and commodities and to defeat all related schemes whereby the public is exploited, the terms "fraud” and "fraudulent practices” to be given a wide meaning so as to embrace all deceitful practices contrary to the plain rules of common honesty, including all acts, even though not originating in any actual evil design to perpetrate fraud or injury upon others,, which do tend to deceive or mislead the purchasing public (People v Federated Radio Corp., 244 NY 33, 38-39). More to the point, in reviewing condominium and co-operative apartment ventures, the most rigid standards of fair dealing and good faith toward tenants are to be imposed on promoters (cf. Gilligan v Tishman Realty & Constr. Co., 283 App Div 157, 161-162, affd 306 NY 974).
Under section 353 of the General Business Law, whenever the Attorney-General shall believe from evidence satisfactory to him that any person, partnership, corporation, company, trust or association has engaged in or is about to engage in any practice or transaction referred to in a previous section of said law and declared to be fraudulent practices, he may bring an action, against such an entity and any other persons theretofore concerned or in any way participating or about to participate in such fraudulent practices, to enjoin such entity or other persons from continuing or engaging in such fraudulent practices or doing an act in furtherance thereof. It is further provided that, should the Attorney-General believe from such evidence that such an entity actually has or is engaged in any such fraudulent practice, he may include in such action an application to enjoin permanently such entity and such other persons as may have been or may be concerned with or in any way participating in such fraudulent practice from selling or offering for sale to the public within this State, as principal, broker, agent or otherwise, any securities issued or to be issued. Although in a Martin Act suit the Attorney-General has been held to enjoy a nonreviewable discretion as to what remedies to seek, having been "given the personal discretion to decide upon the remedies which he wishes to employ” (People v Bunge Corp., 25 NY2d 91, 100), section 353 also specifically states that in such an action "an *596 order or a judgment may be entered awarding the relief applied for or so much thereof as the court may deem proper.”
Section 353-a of the General Business Law provides: "In any action brought by the attorney-general as provided in this article, the court at any stage of the proceedings may appoint a receiver of any and all property derived by the defendant or defendants or any of them by means of any such fraudulent practices, including also all property with which such property has been mingled if such property can not be identified in kind because of such commingling, together with any or all books of account and papers relating to the same” (emphasis supplied). The appointment of such a limited receiver (Burns v Maguire, 255 App Div 552, 555, affd 280 NY 700; Elfast v Lamb, 111 F2d 434, 436-437) is, as statutorily expressed, a matter of judicial discretion (see 49 NY Jur, Receivers, § 14; 7A Weinstein-Korn-Miller, NY Civ Prac, par 6401.05), not reviewable by the Court of Appeals (Dawson v Parsons, 137 NY 605; Ostrander v Weber, 114 NY 95, 103; Cohen and Karger, Powers of the New York Court of Appeals, pp 603-604).
Special Term decreed that the sponsor, the managing agent and the individual defendants be "enjoined from directly or indirectly engaging in or sponsoring further cooperative or condominium offerings for a period of five years from the date of the order [sic] entered herein, but may move, after having been enjoined from said activity for a period of two years, for suspension of the remaining period”, which decretal portion of the order and judgment was not interfered with by the Appellate Division. Section 353 of the General Business Law provides that the Attorney-General may include, in the action brought by him in the name and on behalf of the People of the State of New York, an application to enjoin permanently those entities specified therein from selling or offering for sale to the public within this State in whatsoever capacity any securities issued or to be issued. Subdivision 3 of section 359-g, subdivision 4 before renumbering (see L 1975, ch 154, § 2, eff June 3, 1975), entitled "Modification or dissolution of a permanent injunction”, states in part: "Any person against whom an injunction has been granted under the provisions of this article may apply to the supreme court at any time after five years from the date such permanent injunction became effective, upon at least sixty days notice to the attorney-general, for an order dissolving such injunction or modifying the same *597 upon such terms and conditions as the court deems necessary or desirable.”
In the action by the Attorney-General, a permanent injunction, if applied for, may or may not be granted but, if such relief is awarded, the injunction initially, under the language of the statute, should be perpetual, however different the rule might be as to a "permanent” injunction in another context. This legislative intent is apparent from the employment of the words "enjoin permanently” in section 353, in referring to the Attorney-General’s application, and subdivision 3 of section 359-g which prescribes the five-year period antedating an application for modification or dissolution. This legislative design can also be gleaned from the New York State Legislative Annual for 1963, during which year the subdivision was first enacted (L 1963, ch 953, eff April 30, 1963), in which Annual (pp 107-108) it is stated: "Under the present law permanent injunctions are granted for a variety of reasons, some of them non-criminal in nature, often upon consent of the individual involved who may not realize that in agreeing to entry of the injunction he is forever barred from returning to the business. Sometimes in the future conditions may change so that no good reason might then exist why the injunction should continue. * * * Martin Act injunctions are granted, not as punishment to the individual but as a protection to the public from one who has shown his unfitness to engage in the securities business. * * * This will give the Attorney General a reasonable time to look into the background of the applicant and make a thorough investigation of the applicant’s occupation during the years he was restrained from operating in the securities business. After a long absence, time for reasonable investigation should not injure the applicant. *. * * In short, this bill sets up reasonable rules to enable the Coxirts to intelligently determine whether a person who has already been found unsuitable to engage in dealing in securities should again be permitted to engage in a field where so many innocent victims have lost tremendous sums to tricky or insolvent operators.” In conformity with the language of section 353, the injunction should also apply to "any securities issued or to be issued.” The judgmental provision, that the specified defendants be permitted to move for suspension of the enjoinment after two years, contravenes the statute.
Special Term decreed that nonpurchasing tenants who agreed to quit the premises pursuant to stipulations in settle *598 ment of eviction proceedings in Civil Court might apply to said court for vacation of those stipulations. The Appellate Division modified by ordering that all such agreements be vacated and that enforcement thereof be permanently enjoined. It is beyond question that the Supreme Court, acting under the broad powers conferred upon it, has the inherent power in a proper case to restrain the parties before it from taking action which threatens to defeat or impair its exercise of jurisdiction (Matter of Schneider v Aulisi, 307 NY 376, 383-384; Colson v Pelgram, 259 NY 370, 375-376). This power of courts of equity, in interfering by way of injunction with judicial proceedings, is sparingly exercised and then only upon a clear showing of the necessity therefor, each case depending largely upon its own circumstances (Colson v Pelgram, supra; Moers v Moers, 229 NY 294, 302; Norfolk & New Brunswick Hosiery Co. v Arnold, 143 NY 265, 268-269). Such an injunction is not addressed to the other court; it is directed to and acts only on the litigant party (Steelman v All Continent Corp., 301 US 278, 291; Platt v Woodruff, 61 NY 378, 382; 4 Pomeroy’s Equity Jurisprudence [5th ed], § 1360, p 974; Restatement, Judgments, § 113). This is not a "run of the mill” action for an injunction, but rather one authorized by remedial legislation, brought by the Attorney-General on behalf of the People of the State and for the purposes of preventing fraud and defeating exploitation. Here, where the facts underlying the illegality have been admitted and the conceded acts come within the broad definition of fraudulent practices, the injunction was justified, since the prosecution of a multiplicity of suits is avoided (cf. Erie Ry. Co. v Ramsey, 45 NY 637, 647-648), parties complained of are prevented from making use of the jurisdiction at law contrary to equity and good conscience (see Willard’s Equity Jurisprudence, p 347), the policy of the State in controlling maximum rents and evictions is not subverted (see Richards v Kaskel, 32 NY2d 524, 534), and the efforts of the official designated to protect the public, including tenants who capitulated before exposure of the illegal and fraudulent activity, are not handicapped or thwarted. However, the Appellate Division vacation of the stipulations themselves, not having been accomplished upon an appeal from an order or judgment of the Civil Court, was without jurisdiction (see 10 Carmody-Wait 2d, NY Practice, § 70:168).
Regarding tenants who vacated the apartment house after the declaration of effectiveness, Special Term decreed: "that *599 no further sales or cooperative interests in realty as regards the building known as 150 East 61st Street, New York, New York, may be made until a new amendment to the offering plan for said building is duly filed by holders of unsold shares in accordance with applicable laws and regulations, and said amendment shall contain provisions for adequate notice to tenants who vacated their apartments at 150 East 61st Street after the declaration of effectiveness including the mailing of said notice and the publication of notice in New York newspapers concerning their right of first refusal as to any apartment now vacant or to become vacant, enabling such tenants to return as rent stabilized tenant[s] with all the rights, including the right to renewal of leases for rent stabilized tenants, and provisions for acceptance and implementation of said right of first refusal, and provisions for the setting of rents under the provisions of the Rent Stabilization Law and Code, and provisions for implementation of all other aspects of this judgment”. This provision was abrogated by the Appellate Division order that such tenants have abandoned their claim and shall not have the right to return to tenancy as rent stabilized tenants. Once a court of equity has jurisdiction of a cause, it has the power to dispose of all matters at issue and grant complete relief (Ferguson v Village of Hamburg, 272 NY 234, 239). The tenants who signed stipulations to quit their apartments, at a time when resistance to the co-operative plan seemed hopeless, should have no greater rights than other bona fide tenants in occupancy who vacated after the declaration of effectiveness. Both classes of tenants were victimized by the same conduct and to equal degree and Special Term, in this respect, completed its work and, consistently, extended a measure of relief to each group (cf. Gucker v Town of Huntington, 268 NY 43, 51).
Accordingly, the order appealed from should be modified: by providing that defendants Lexington Sixty-First Associates, Arthur Bresciani, Benjamin J. Denihan and Manhattan East Apt./Hotels be enjoined permanently from selling or offering for sale to the public within this State, as principal, broker, agent, or otherwise, any securities issued or to be issued, without prejudice to the right to apply for modification or dissolution of said permanent injunction, at any time after five years from the date such permanent injunction becomes effective, pursuant to subdivision 3 of section 359-g of the General Business Law, or within such period as may be *600 provided for in and pursuant to any amendment to said subdivision or any substitute thereof which may be hereinafter enacted; by providing that the provision in said order, that the stipulations signed by nonpurchasing tenants in settlement of eviction proceedings be vacated, be deleted therefrom; and by providing that the provision in said order, that tenants who have vacated their apartments after the declaration of effectiveness of the offering plan have abandoned their claim and shall not have the right to return to tenancy as rent stabilized tenants, be deleted therefrom. Except as so modified, said order is affirmed, with costs against defendants filing briefs herein.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
Order modified, with costs to plaintiff against defendants filing briefs herein, in accordance with the opinion herein and, as so modified, affirmed.