OPINION OF THE COURT
Stanley L. Sklar, J.
The Attorney-General seeks a preliminary injunction restraining defendants from promoting, negotiating, advertising, offering for sale, selling or closing title to “cooperativé interests” in 820 President Street, Brooklyn, New York (the building) or any other security as defined in section 352 of the General Business Law. This action is brought pursuant to article 23-A of the General Business Law (the Martin Act) and subdivision 12 of section 63 of the Executive Law.
On June 15, 1980, defendants, seeking to convert 820 President Street to co-operative ownership, submitted a proposed “eviction” type plan for prefiling review by the Attorney-General. (Defendant 820 Associates is alleged to be a partnership consisting of Mosconi and Poggioli and *902 serves as the managing agent of the building. Defendant Top of the Slope Realty is alleged to be a real estate agency exclusively owned and operated by Mosconi and Poggioli.) The plan indicated that the premises contained 15 apartments, 12 of which were rent stabilized.
Section 352-e of the General Business Law declares that no public offering of any securities consisting of participation interests in real estate, including shares of a cooperative housing corporation may be made unless the plan, containing the information specified in section 352-e (subd 1, par [b]) is filed with the Attorney-General. Within 30 days after submission of the plan the Attorney-General shall issue a letter stating that the plan has been filed or indicating the deficiencies in the plan. The Attorney-General may investigate any proposed offering should it appear that a sponsor has employed, employs or is about to employ false representations or devices which would operate as a fraud upon a purchaser. (General Business Law, § 352.) The Attorney-General is granted wide discretion in effectuating the policy of article 23-A of the General Business Law.
The reasons underlying the statutory structure are obvious. The potential for perpetrating a fraud in offering shares in a co-operative housing corporation is great. This is especially true when the plan is an “eviction” type plan, and approval of the plan depends on an agreement to purchase by at least 35% of the rent-stabilized tenants who are tenants of record or prime tenants in a building. (Code of Rent Stabilization Association of New York City, Inc., § 61; see General Business Law, § 352-e.)
The Martin Act (General Business Law, art 23-A), also seeks to insure that prospective purchasers, i.e., the public, have the opportunity to make an informed determination whether or not to purchase shares in a co-operative housing corporation.
The Attorney-General investigated the circumstances surrounding this proposed co-operative conversion plan. The investigation included oral examinations of Bernard Mosconi, Gordon Meltzer, a former tenant and Tracy Young, a tenant.
*903 As a result of that investigation, the Attorney-General claims that the defendants engaged in fraudulent and deceptive practices and harassment to induce the tenants of the building to vacate. The Attorney-General also contends that the defendants engaged in a course of conduct designed to replace bona fide tenants with bogus prime tenants of their own choosing who would provide the requisite number of tenants for approval of the conversion plan. The affidavits submitted in support of the application by the Attorney-General’s office present a disturbing pattern of conduct on the part of Messrs. Mosconi and Poggioli.
FALSE TENANCIES
For example, at least five apartments were leased to the defendants’ friends, relatives or business associates who never resided in the respective apartments. Also, they told those friends, relatives and associates of their intention to convert. The tenants who actually occupied the premises sublet their apartments. However, none of the sublessees ever had any contact with the prime tenants. The subtenants, with one partial exception, paid their rent directly to the defendants.
HARASSMENT
The defendants allegedly harassed several tenants. The defendants repeatedly represented that 35% of the tenants had approved the conversion plan, thereby creating the necessary leverage to remove certain other tenants from their apartments. These claimed misrepresentations coupled with offers of money to vacate the apartments succeeded in a number of cases, as set forth in the moving papers. At least one tenant was repeatedly sued for nonpayment which suits were either dismissed or withdrawn on proof submitted by the tenant that the rents had been paid. Other tenants were told by the defendants that they would withhold essential services if the tenants refused to vacate their apartment. These same two tenants were sued unsuccessfully before the Conciliation and Appeals Board by the defendants who claimed that they needed the apartment for defendant’s daughter.
Defendants claim that the Attorney-General’s application is premature and further claim that they have not *904 engaged in fraudulent practices in furtherance of their efforts to convert the premises.
First, defendants claim that the Attorney-General is without the authority to take any action on the proposed plan since the plan was merely preliminary and was submitted pursuant to 13 NYCRR 17.3 for comments and guidance concerning any deficiencies.
Second, defendants claim that the conduct complained of, i.e., renting apartments to relatives, business associates and friends; offering money to tenants to vacate their apartments; instituting proceedings in Housing Court for claimed tenant defalcations, are not illegal, deceptive or fraudulent.
Third, defendants claim that none of the allegations concerning representations that 35% of the tenants had approved the conversion are supported by legally competent evidence.
Finally, defendants have annexed an affidavit of Richard Bresloff, a former tenant of the building in which Bresloff denies having been subjected to any form of harassment or pressure to vacate his apartment. He claims that all of his utility charges were paid by the prime tenant.
TIMELINESS
Defendants’ claim that the Attorney-General’s action is premature is without merit. Defendants rely on 13 NYCRR 17.3, which delineates the procedure for preliminary review of proposed conversion plans and on Apfelberg v East 56th Plaza (78 AD2d 606). The regulations and case cited are inapposite. True, the regulations cited set forth a preliminary or prefiling procedure. However, the regulations do not proscribe the institution of an action by the Attorney-General to enjoin conduct by defendants whom the Attorney-General finds to have engaged in fraudulent and deceptive practices. The interpretation urged by defendants would result in the anomalous situation of permitting a sponsor to engage in, or lay the groundwork for, fraudulent practices so as to assure the success of a conversion plan once the final plan is filed. This theory that a sponsor can engage in fraudulent and harassing tactics with impunity if done early is repugnant to the remedial *905 purpose and the meaning of the statute. The Attorney-General and this court are not powerless to prevent, or stop, a scheme of early fraud and harassment.
Even the Apfelberg decision cited by the defendants in support of their contention that the instant action is premature, actually stands for the principle that this court may act to terminate a scheme of early fraud and harassment. In Apfelberg, tenants instituted an action against sponsors of a co-operative housing plan and the Attorney-General, alleging that the sponsors were engaged in fraudulent practices and that the Attorney-General failed to fulfill his responsibility to thoroughly investigate such offering plans (the action against the Attorney-General was dismissed and no appeal was taken). The court held that the tenants’ action was premature at the prefiling stage since “the Attorney-General has exclusive responsibility of passing on the sufficiency of the offering ‘statement’ or ‘prospectus’ or ‘plan’”. (Apfelberg v East 56th Plaza, supra, p 606.) The court further held (p 607) that the “filing requirement is informational only”, and that the Attorney-General was not precluded from taking whatever action he deemed necessary, including causing an investigation to be made, and/or seeking injunctive relief.
Specifically, section 353 of the General Business Law authorizes the Attorney-General to take action when it appears that a sponsor of a co-operative conversion plan is employing or is about to employ fraudulent practices in furtherance of a plan. A “plan” is defined as every plan submitted to the Attorney-General for review. (General Business Law, § 352-eeee, subd 1, par [a].) See, also, section 352-c of the General Business Law which prohibits fraudulent practices in the offering or sale, negotiation, etc., of securities regardless of whether “issuance, distribution, exchange, sale, negotiation or purchase resulted.” (Matter of Attorney-General of State of N. Y. [Cenvill Communities], 82 Misc 2d 418.)
Where, as here, the Attorney-General is acting pursuant to the Martin Act on behalf of the People of the State of New York, in furtherance of the public interest, to avert substantial and irreparable injury, his powers are broadly construed. (People v Lexington Sixty-First Assoc., 38 NY2d *906 588; Matter of Attorney-General of State of N. Y. [American Research Council], 10 NY2d 108, cert den 368 US 947.) In People v Lexington Sixty-First Assoc. (supra, p 595). the court stated: “The purpose of the law is to prevent all kinds of fraud in connection with the sale of securities and commodities and to defeat all related schemes whereby the public is exploited, the terms ‘fraud’ and ‘fraudulent practices’ to be given a wide meaning so as to embrace all deceitful practices contrary to the plain, rules of common honesty, including all acts, even though not originating in any actual evil design to perpetrate fraud or injury upon others, which do tend to deceive or mislead the purchasing public”.
Clearly, defendants’ contention that the instant action was prematurely instituted is without any merit.
THE PROHIBITED PRACTICES
Our next questions are whether the defendants’ conduct constitutes fraudulent or deceptive practices within the meaning of the Martin Act, and if so, whether a preliminary injunction is appropriate under the circumstances.
Defendants’ contentions, as noted above, that their conduct was not fraudulent are without merit. Defendants’ analysis consists of a cursory and fragmented examination of the schemes investigated by the Attorney-General analyzing each one separately. This court holds that the fraudulent and harassing techniques used by the defendants are within the proscription of the Martin Act. It might well be, as urged by defendants, that some of the activities engaged in by defendants might be permissible in another context. For example, a landlord might, in many circumstances, properly pay money to a tenant to vacate an apartment, or a landlord might properly rent an apartment to a friend, relative or a business associate. But, when the landlord in order to help secure the 35% required for conversion, pays money to a tenant to vacate an apartment in a building that is, or is about to be, the subject of a co-operative conversion filing, the payment is improper. When a landlord rents to a bogus prime tenant so as to control the apartment and have it included in the 35% necessary for the conversion, the action is improper. When the sponsor or
*907 those affiliated with the sponsor tell tenants, truthfully or untruthfully, that they have the necessary 35% for a conversion, they are applying improper pressure. When a landlord repeatedly sues a tenant, who has actually paid rent, for nonpayment, the pattern is improper — particularly in the context of a scheme to force the tenant out during a conversion effort. When a landlord seeks, without justification, to obtain an apartment for the use of an immediate member of his family, that action is improper. When a landlord threatens to withhold essential services, his threats are improper. The affidavit of one tenant, Richard Bresloff, who was given an apartment in another building owned by defendant, to the effect that he was not harassed does not diminish the fraudulent and harassing pressures to which other tenants were subjected by these defendants. Certainly, viewed as a whole, the Attorney-General has unearthed and adequately proven a scandalous scheme and pattern designed to circumvent the standards of decency and fair dealing with tenants required by the Martin Act.
As our Court of Appeals said in People v Lexington Sixty-First Assoc. (supra, p 595) “[m]ore to the point, in reviewing condominium and co-operative apartment ventures, the most rigid standards of fair dealing and good faith toward tenants are [required]”. The Attorney-General has established, based on all the evidence adduced in the records, his likelihood of success and also the likelihood of irreparable harm to the public.
Accordingly, the Attorney-General’s application for a preliminary injunction restraining defendants from promoting, negotiating, advertising, offering for sale, selling or closing title to “co-operative interests” in 820 President Street or any other security as defined in section 352 of the General Business Law is granted.