OPINION OF THE COURT
Robert C. Williams, J.
Defendant moves pursuant to CPLR 3211 (a) (7) to dismiss for failure to state a cause of action. Plaintiff cross-moves, pursuant to CPLR 3211 (c), for summary judgment.
Plaintiff markets, outside of New York, memberships in a system of outdoor resort campgrounds which consist of campsites and various recreational amenities which are available to recreational vehicle owners and outdoor-oriented families.
Campground and parking sites are available on a first-come, first-served basis, with the exception of reservations being taken for the three major weekends during the “camping season”: Memorial Day; the Fourth of July, and Labor Day. Utility services and amenities, such as a general store, a recreational area, a swimming area, etc., are usually included.
Purchasers, for their initial membership fee (listed as ranging from $4,495 to $6,095) plus the annual fee of $152 (to be *146 increased only up to the extent of an increase in the Consumer Price Index [CPI] for urban Seattle, Washington, as reported by the U. S. Department of Labor, Bureau of Labor Statistics; although during oral argument it was stated that the increase was now based upon the CPI for Chicago, Illinois), are entitled to a nonexclusive and nonspecific use of the recreational facilities, together with the limited use of additional campground facilities if the member purchases a membership in Camp Coast to Coast for $16 (which entitles members to use other participating campgrounds around the country).
The members’ interest is purported not to include any legal or beneficial interest in plaintiff or its assets, in property, contract rights or business of plaintiff, any share of income, gain or distribution by or of plaintiff, or any voting rights in plaintiff or pertaining to its business.
Defendant maintains that General Business Law § 352-e requires plaintiff to file an offering statement or prospectus before selling memberships in New York State. Due to this contention, defendant asserts that plaintiff’s complaint fails to state a cause of action.
General Business Law § 352-e (1) (a) reads, in pertinent part: “1. (a) It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to make or take part in a public offering or sale in or from the state of New York of securitiés constituted of participation interests or investments in real estate, mortgages or leases, including stocks, bonds, debentures, evidences of interest or indebtedness, limited partnership interests or other security or securities as defined in section three hundred fifty-two of this article, when such securities consist primarily of participation interests or investments in one or more real estate ventures, including cooperative interests in realty, unless and until there shall have been filed with the department of law, prior to such offering, a written statement or statements, to be known as an ‘offering statement’ or ‘prospectus’ concerning the contemplated offering”.
It is plaintiff’s desire to sell memberships in New York which precipitated the invocation of General Business Law § 352-e and the present litigation.
Initially, defendant argues that the memberships are “securities” within the meaning of section 352-e.
In Matter of Waldstein (160 Misc 763, 767), it was stated that “[i]n general, it may be said that any form of instrument used for *147 the purpose of financing and promoting enterprises, and which is designed for investment, is a security according to the modern meaning of that term.”
The first portion of the Waldstein (supra, p 767) definition, that the instrument be “used for the purpose of financing and promoting enterprises” appears to be similar, if not identical, to the “risk-capital” theory expounded in Silver Hills Country Club v Sobieski (55 Cal 2d 811, 361 P2d 906), wherein the court there held that the sale of securities condemned involves: an attempt by an issuer to raise funds for a business venture or enterprise; an indiscriminate offering to the public at large where the persons solicited are selected at random; a passive position on the part of the investor; and the conduct of the enterprise by the issuer with other people’s money (supra, at pp 814-815). Silver Hills goes on to state, however, that “[w]e have here nothing like the ordinary sale of a right to use existing facilities. Petitioners are soliciting the risk capital with which to develop a business for profit” (supra, at p 815).
Plaintiff asserts that its paid-in capital is in excess of its acquisition costs such that it does not utilize the moneys received from sale of the memberships for the “develop[ment] [of] a business for profit”. In other words, plaintiff argues that the members are purchasing the right to use existing facilities, the membership fees being used to maintain the facilities, not acquire them.
Defendant maintains that plaintiff obtained over $8 million from sales of memberships prior to October 31, 1983, and that most of it was probably used for acquisitions. Absent proof of such a claim, however, this court feels compelled to accept plaintiff’s assessment of the use of its funds subject to our findings below. A “wrinkle” exists, however.
In plaintiff’s Securities and Exchange Commission (SEC) offering statement it is stated: “The Company expects that its cash requirements will increase as additional resorts are acquired and improved, and as its working capital needs increase. The Company plans to meet its future cash requirements from borrowings on lines of credit secured by membership receivables, real estate loans, and private and public offerings of debt or equity securities.”
It appears that although membership fees are not used to “develop” the business by acquiring new facilities, membership receivables are borrowed upon as a basis for a line of credit. Such an arrangement, at first glance, appears to raise the spectre of *148 the “risk-capital” test. As stated above, however, the “risk-capital” test does not apply when purchasers are buying the right to use existing facilities. This court holds that persons, when buying memberships, are buying the right to use the existing campgrounds, and are not merely funding a business venture for a developing business. The court takes notice that many if not most businesses seek to expand and grow, and the fact that plaintiff desires to do so and utilize some of its funds for that purpose is of no legal consequence. The purpose behind the “risk-capital” test appears to be to prevent persons from giving money to promoters of a business to help develop or begin that business, the funds clearly being designated “risk-capital” due to the unsure nature of the business as not having yet begun. In the present situation, the purchase of memberships entitle members to utilize existing facilities with the hope that it will grow, giving the member a greater assortment of facilities to choose from. With the exception of the general risk that plaintiff will go out of business due to poor management, embezzlement, etc., a risk which every business of necessity incurs, there is no risk involved in the purchasing of plaintiff’s memberships sufficient to cause this court to invoke the “risk-capital” test and its consequences. This is, of course, assuming, arguendo, that this court would have utilized the “risk-capital” test, which has not yet been so utilized or accepted in this State.
Although the determination above with respect to the “risk-capital” tests appears to take the memberships out of the context of the definition of “security” as enunciated in Matter of Waldstein (supra), the second portion of that definition, to wit, whether or not the memberships are “designed for investment”, deserves attention.
The membership documents clearly set forth numerous restrictions with respect to the transfer of memberships. The memberships: máy not be transferred for two years after the date of acceptance, except to family members by operation of law; may not be transferred in excess of the original purchase price plus a reasonable cost of transfer (which is paid to plaintiff, not the member); may not be transferred more than twice; may be sold only once; may not be transferred unless the member is current in all payment obligations to plaintiff; and shall terminate upon the death of the second transferee. These restrictions, plus the fact that the membership documents specifically state that the memberships are not investments, gives credence to the belief that they are not bought for investment purposes.
In Securities & Exch. Commn. v Howey Co. (328 US 293, 298-299), the United States Supreme Court, after discussing the *149 traditional forms of securities (e.g., stocks), which the present memberships do not fall under, defined an “investment contract”, stated to be another form of security: “a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party”. The term “solely” has since been interpreted to mean “substantially” (Securities & Exch. Commn. v Turner Enter., 474 F2d 476).
As stated previously, it does not appear that a member is led to expect profits. Profit has been defined as either “capital appreciation resulting from the development of the initial investment * * * or a participation in earnings resulting from the use of investors’ funds” (United Hous. Found, v Forman, 421 US 837, 852). From the discussions above, it is apparent that the Howey test concludes that there is no investment contract. Therefore, it appears that defendant’s argument must stand or fall based upon this court’s interpretation of the terms “participation interests * * * in real estate” and “cooperative interests in realty”, the latter being subsumed within the former.
Defendant argues that a broad reading of the terms stated immediately above would include the memberships sold by plaintiff. It is law in this State that the Martin Act (General Business Law art 23-A) should be liberally construed in order to attain the principal objective of the statute, the protection of the public (People v Federated Radio Corp., 244 NY 33; see also, People v Lexington Sixty-First Assoc., 38 NY2d 588).
Plaintiff maintains, however, that members do not acquire an interest in real estate, but merely a “use” or a “right to a use”. The question then exists whether or not a “use” or a “right to a use” can be considered an “interest” within the meaning of General Business Law § 352-e.
In State of Nevada, Dept. of Commerce v Carriage House Assoc. (94 Nev 707, 585 P2d 1337), the Supreme Court of Nevada held that a “vacation license”, where purchasers acquired the contractual right to reserve for occupancy a unit of a resort condominium (commonly known as “time-sharing”), did not constitute or convey an interest in real property. The court specifically noted with agreement the District Court’s analysis that said vacation licenses were an anomaly of the law, requiring the Legislature to specifically act if they desired to regulate them. Relevant to the present litigation is the finding by that court that the vacation license was not a leasehold interest since “it [was] not definite as to its duration or description of the property involved” (supra, at p 709). The memberships presently the *150 subject of this litigation can be analogized to the vacation licenses in Carriage House.
In Cal-Am Corp. v Department of Real Estate (104 Cal App 3d 453, 163 Cal Rptr 729), however, the Court of Appeals, Second District, disagreed with the rationale in Carriage House (supra), in holding that a time-sharing agreement with respect to a resort condominium in Hawaii, specifically the membership interests sold, constituted interests in real property. The court in Cal-Am found the membership interests to be in the nature of a lease, stating: “The test for determining whether an agreement for the use of real property is a license or a lease is whether the contract gives exclusive possession of the premises against all the world, including the owner, in which case it is a lease, or whether it merely confers a privilege to occupy under the owner, in which case it is a license * * * Membership in RHAC grants the right to exclusively possess a resort condominium unit during the member’s annual period. Despite appellant’s contentions, the fact that RHAC retains the right to specify which unit will be occupied and to provide maintenance and maid services to each unit does not derogate the exclusive possessory interests of the members during their annual periods of one to four weeks. The membership agreement itself guarantees to members the right to occupy, during their annual periods, one of the club’s condominiums. One who buys exclusive occupancy, even for only a portion of each year, in a condominium, occupies a special position with relation to a portion of the condominium premises. Regardless of the term used to describe the purchaser’s right of exclusive occupancy, it is an estate or interest or possessory interest in the property itself.” (Supra, at pp 457-458.)
Another factor pointed out as important was the fact that members held their interest for a specific time (until Dec. 31, 2041), as contrasted to the lack of a specific time for the existence of the memberships in Carriage House (supra).
There are certain factual distinctions between the memberships in Cal-Am (supra) and those present here which facilitate against this court’s acceptance of the rationale there used.
Initially, the court in Cal-Am (supra, p 457) talks of “the member’s annual period” referring to a specific period of time within which the member is allowed to use his unit. In the present situation, the member has no set time, being allowed to utilize the campgrounds for up to 14 days at any one time.
Secondly, the membership agreement in Cal-Am (supra) guaranteed the members the right to occupy their unit during *151 their annual period. As stated above, use of plaintiff’s campsites, with the exception of the three major “fair weather” holidays, is on a first-come, first-served basis. A member is not guaranteed that he will have a site available to him.
Thirdly, as in Carriage House (supra) and as specifically not existing in Cal-Am (supra), the memberships present here are for no exact duration (see restrictions, supra). It is accepted law in this State that “[t]he duration of the term of a lease must be certain, either by the express limitation of the parties at the time the lease was made, or ascertainable by reference to some collateral fact which may with equal certainty measure the continuance of the term” (33 NY Jur, Landlord & Tenant, § 24, at 311; see also, Western Transp. Co. v Lansing, 49 NY 499; Kavanaugh v Cohoes Power & Light Corp., 114 Misc 590). Similarly, a lease must describe the premises with certainty in New York (33 NY Jur, Landlord & Tenant, § 26, at 312), and the membership documents do not with certainty describe any particular site. It’s now apparent that the memberships do not constitute leases, within the meaning of the law of the State of New York.
Defendant next points to People v Development Servs. (AJ) (92 Misc 2d 759). In Development Servs., purchasers purchased land in fee simple and were required to become members of the defendant club. The Attorney-General there made similar arguments as here: that the arrangement constituted a “ ‘co-operative interest * * * in realty’ ” under a broad reading of that term since it was contended that “the intent of the Martin Act is to protect parties purchasing a nonprofit participatory interest in realty, as well as to protect investors for profit in a realty venture” (supra, at pp 761-762), and that the investment by the promoters of the members’ money for construction of the common elements constitutes the solicitation of “risk-capital”. The Supreme Court of New York County found the arrangement there to be within the purview of the Martin Act.
The court held that: “[t]he obvious intent of the transactions was to grant to the purchasers an irrevocable right to the concomitant benefits of sharing in the projected facilities, the retention of formal ownership therein by the club being but incidental to this overriding consideration. Since the undeniable substance of the transactions entails a justifiable expectation of permanent access to the common elements, the purchasers should not be denied the protection of the statute merely because defendants have conceived a contractual method which at first blush might appear to circumvent the statutory purpose”. (Supra, at p 762.)
*152 To the extent that the court in Development Servs. (supra, p 761) held that the memberships there present constituted “ ‘cooperative interests in realty’ ” due to the intent of the Martin Act being to protect parties purchasing a nonprofit participatory interest in realty, this court will not accept its rationale.
David J. Kaufmann and Orestes J. Mihaly, in a Practice Commentary (McKinney’s Cons Laws of NY, Book 19, General Business Law, art 23-A, part V et seq., p 16), give a thorough analysis of the Martin Act, with respect to its legislative history, construction, and the subject matter covered by it. Throughout their article, the reader is impressed by one overriding factor, to wit, that the Martin Act was intended to protect persons entering into arrangements expecting to realize profit. People v Smith Co. (230 App Div 268, 269) is quoted: “The [Martin Act] is remedial in its nature, and was passed to protect the inexperienced, confiding and credulous investor, and save him from his own foolish cupidity” (emphasis supplied). Similarly, throughout the article one becomes aware that the purpose of the Martin Act was not to protect all consumers from business fraud, but to protect them in the narrower situation where their money was being invested, with expectations or hopes of profit or capital gain.
Also, as previously stated, any reliance by the court in Development Servs. (supra) on the “risk-capital” test is similarly unpersuasive, in that this court has found it has no application to the present facts, assuming, arguendo, New York accepted it as a valid proposition of law.
In Matter of Gardner v Lefkowitz (97 Misc 2d 806, 812), the Supreme Court of New York County held that “[t]he Martin Act (New York State) and the Securities Acts of 1933 and 1934 (Federal) are virtually identical in their design and scope, and the purpose for which they were enacted.” As stated above, the memberships present here would not be deemed securities within the meaning of the Federal acts (Securities & Exch. Commn. v Howey Co., 328 US 293, supra). The court in Gardner went even further, however, and held: “The intent of the Legislature in enacting article 23-A of the General Business Law, commonly known as the Martin Act, was the protection of the public in its relations with the business world, specifically in that area concerning the public’s investment of money therein, for the purpose of realizing a profit. This fact was recognized and acknowledged by the Court of Appeals in [People v Federated Radio Corp., supra].” (Supra, at p 809.)
*153 Therefore, the very same court which appeared to accept the proposition that the intent of the Martin Act was to protect a person purchasing a nonprofit participatory interest in realty subsequently held that the Martin Act was intended to relate to public investment “for the purpose of realizing a profit.” Even if this court were to ignore the notion of profit, we have already held that it does not appear that the memberships constitute a “participatory interest in realty” (which, it is noted, is stated by General Business Law § 352-e in terms of a “security”, which is defined in terms of profit).
In searching for the meaning of “security”, form should be disregarded for substance and the emphasis should be on economic reality (Tcherepnin v Knight, 389 US 332,336). This court holds that the economic realities of the memberships present here are such that they do not constitute “securities” within the meaning of section 352-e. As stated in Dunwoody Country Club v Fortson (243 Ga 236, 239-240, 253 SE2d 700, 703), wherein the question of whether or not a similar membership in a country club constituted a “security” was raised, the purchasing of a membership sold by plaintiff is the “purchasing [of] a social or recreational opportunity and not an investment opportunity” such that the “membership certificate is not a security.”
This court agrees with defendant that consumers must be protected from fraud in the sale of campsite memberships such as those sold by plaintiff, but agrees with plaintiff that General Business Law § 352-e was not intended to be the mechanism by which consumers were to be protected in the sale of non-profit-oriented memberships. As stated by the court in Carriage House (supra), it is for the Legislature to so determine, and not for the courts, by judicial legislating, to construe an inapplicable statute.
The court denies defendant’s motion to dismiss the complaint for failure to state a cause of action. Plaintiff’s motion for summary judgment is granted.