David T. BISHOP, Plaintiff,

v.

COMMODITY EXCHANGE, INC., Raymond Nessim, Phibro Corp., formerly d/b/a Engelhard Minerals & Chemicals Corp., Philipp Brothers Div., Henry G. Jarecki, Mocatta Metals Corp., Edward H. Hoffstatter, Jr., Sharps-Pixley, Inc., Henry G. Eisenberg, Brandeis, Goldschmidt & Co., Inc., Robert G. Gremald, Ametalco, Inc., Irving Redel, Redel Trading Company, Inc., Herbery J. Coyne, J. Aron & Co., Inc., Moses Marx and United Equities Commodities, Inc., Defendants.

No. 82 Civ. 0312 (MEL).

United States District Court, S.D. New York.

June 13, 1983.

Kreindler & Kreindler, New York City, for plaintiff; Michel F. Baumeister, Donald I. Marlin, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendant Governors; Dennis J. Block, Irwin H. Warren, Kenneth L. Steinthal, Susanna M. Lowy, New York City, of counsel.

Baer, Marks & Upham, New York City, for defendant Comex; Eugene R. Scheiman, Barry J. Mandel, Thomas E. Albright, William A. Brandt, Jr., Joshua B. Parker, New York City, of counsel.

LASKER, District Judge.

Defendants move pursuant to Fed.R. Civ.Pr. 12(b)(6) and 9(b) to dismiss the complaint in this action which alleges manipulation of the market for silver futures contracts. Familiarity with the earlier decision in this case, 562 F.Supp. 516 (S.D.N.Y.1983), is assumed.

David Bishop, who held a "long position" in silver futures in January, 1980, complains that the promulgation by the Commodity Exchange, Inc. ("Comex") of a "liquidation only rule" ("the rule") constituted bad faith on the part of the Comex Board of Governors, in that the Governors who enacted the rule did so "[i]n order to derive direct financial benefits and to advance their own individual and/or corporate 'interests'" (Complaint ¶ 33). Bishop alleges that the enactment of the rule violated the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.* (the "CEA"), and New York Gen.Bus.Law § 352 *et seq.* (the "Martin Act").[1]

---

1. The complaint also alleged a violation of the common law of fiduciary duty. However, Bishop offered no response, either in his brief or at oral argument, to defendants' contention that no such duty exists in the circumstances presented. Accordingly, we deem the fiduciary duty claim to have been withdrawn.

Comex and the individual Governors argue that the complaint fails to state a claim because: (1) there is no private right of action for bad faith rulemaking, particularly where the exchange's action has been ratified by the Commodities Futures Trading Commission ("CFTC") as defendants allege occurred here; (2) the complaint fails to allege that the rule was unreasonable; (3) the complaint fails to satisfy the particularity requirement of Fed.R.Civ.Pr. 9(b); and (4) the Martin Act is preempted by the CEA, and, in any event, the complaint fails to state a claim under the Martin Act. The Governors also allege that they are immune from suit with respect to their actions in promulgating emergency rules.

Bishop answers: (1) that the Supreme Court's recent decision in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), established the right of private plaintiffs to sue for the conduct alleged here; (2) that it is not necessary to plead that the rule was unreasonable; (3) that the complaint gives defendants ample notice of the claims against them; (4) that the complaint states a claim under the Martin Act, which was not preempted by passage of the CEA; and (5) that the Governors are not entitled to immunity.

## I. *The Private Right of Action*

In *Curran*, the Supreme Court ruled that Congress impliedly created a private right of action for violation of the CEA. The *Curran* plaintiffs alleged that the exchanges had failed to fulfill their statutory duties to enforce the rules prohibiting manipulation of prices of futures contracts. 456 U.S. at 394, 102 S.Ct. at 1847. The defendants here allege that the rulemaking which they undertook is distinguishable from failure to enforce anti-manipulation rules because: (a) exchange rulemaking is reviewed by the CFTC; (b) private suits which attack the actions of rulemaking will impair the self-regulatory scheme established by the CEA; and (c) the cases on which the Supreme Court relied in finding that the courts had consistently recognized a private right of action under the CEA did not concern rulemaking. Defendants also contend that their actions were approved by the CFTC and that such approval immunizes their actions from private suit.

▪ (a) The fact that the CFTC is charged with reviewing rules promulgated by exchanges does not lead to the conclusion that such rules may not be the subject of private suits. To the contrary, the legislative history of the CEA indicates that the 1974 amendments which created the CFTC were intended to supplement, not to replace, private suits as a means of regulating commodities trading:

> "Congress in 1974 created new procedures through which traders might seek relief for violations of the CEA, but the legislative evidence indicates that these informal procedures were intended to *supplement* rather than supplant the judicial remedy. These procedures do not substitute for the private remedy either as a means of compensating injured traders or as a means of enforcing compliance with the statute."

*Curran*, 456 U.S. at 384, 102 S.Ct. at 1842 (emphasis added).

(b) Defendants' argument that private actions will impair the CEA's self-regulatory scheme was also rejected in *Curran*. The Court concluded that "Congress viewed private litigation against exchanges as a valuable component of the self-regulation concept." *Id.*

▪ (c) Nor is *Curran* distinguishable from the instant case on the ground that the present action alleges a type of manipulation different from that alleged in the cases reviewed in *Curran*. There is no indication in *Curran* that the private right of action which it recognized was limited to the specific factual contexts presented in those cases. The CEA prohibits manipulation, and anti-manipulation statutes are generally interpreted to encompass "the full range of ingenious devices that might be used to manipulate." *Sante Fe Industries v. Green*, 430 U.S. 462, 477, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977).

Moreover, *Curran* cited with approval *Chicago Mercantile Exchange v. Deaktor*,

414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973), in which the plaintiffs had alleged that orders promulgated by the Chicago Mercantile Exchange constituted manipulation. Defendants correctly note that the issue reviewed in *Deaktor* did not concern the existence of a private right of action; however, *Curran* states that, in *Deaktor,* the Court "did not question the availability of a private remedy under the CEA." 456 U.S. at 380, 102 S.Ct. at 1840. In sum, there is no intimation in *Curran* that the Supreme Court disapproved in any way the Seventh Circuit's ruling in *Deaktor* upholding a private right of action for manipulation by rulemaking.

■ Accordingly, we conclude that the CEA, as interpreted by the Supreme Court in *Curran,* creates a private right of action for the type of commodities manipulation alleged in the instant complaint.

Defendants' contention that the action should be dismissed because the CFTC "sanctioned" the rules at issue here is also unpersuasive. The proposition that the CFTC has sanctioned the "liquidation only" rule is not only disputed, it is not even supported by the record presented by defendants. First, the CFTC report relied on by defendants, the "Rule Enforcement Review of the Commodity Exchange, Inc.," prepared by the CFTC Division of Trading and Markets (Exhibit B to Comex Memorandum of Law)[2] is redacted to such an extent that it is impossible to draw a conclusion about the Division's findings. More important, the parties inform us that another CFTC investigation of exchange actions respecting the silver market during 1979–1980 is *currently* pending. (Comex Memorandum at 12 n. *; Bishop Memorandum at 12). Under the circumstances, it is unnecessary to reach the question whether CFTC approval would immunize exchange action

on the present record, we have no way of knowing whether the Comex actions at issue here will ever be ratified by the CFTC.

## II. *Reasonableness*

Defendants contend that the complaint is defective because Bishop fails to allege that the rule in question was unreasonable. They argue that if the rule was reasonable, it, and defendants' motives in enacting it, did not damage Bishop. Bishop answers that he *was* damaged by the rule: he alleges that the rule, which he contends was enacted as a result of defendants' bad faith, caused a decrease in prices, which caused him to suffer pecuniary losses. Bishop seeks to prove that, had the defendants been guided by the public interest instead of their private interests, they could and should have enacted a rule which would have caused less pecuniary damage to the "longs."

■ The question whether, in a case alleging manipulation of the market by the device of rulemaking, it must be alleged that the rule adopted was unreasonable, appears to be one of first impression.[3] Several cases have recognized a requirement that a plaintiff plead that the rule was approved in bad faith, *see, e.g., P.J. Taggares Co., Inc. v. New York Mercantile Exchange,* 476 F.Supp. 72 (S.D.N.Y.1979), *Daniel v. Board of Trade,* 164 F.2d 815 (7th Cir.1947); however, to our knowledge, none has addressed the question whether an allegation of bad faith is sufficient, standing alone, to state a claim, or whether a plaintiff must also allege that the rulemaker's action was unreasonable.

In order to receive CFTC designation as a contract market, a board of trade must undertake to prevent manipulation of prices and cornering of commodities. 7 U.S.C. § 7(d). In addition, boards of trade desig-

---

**2.** The CFTC's Division of Trading and Markets reviewed Comex's emergency rules of January, 1980 in a Rule Enforcement Review dated September 29, 1981.

**3.** We reject defendants' contention that the case is governed by a routine application of the business judgment rule. Comex is not merely a private corporation whose board of directors

is responsible primarily to its shareholders. It has applied for and received designation by the CFTC as a "contract market," pursuant to 7 U.S.C. § 7, subject to the condition that it "provide for the prevention of manipulation of prices and the cornering of any commodity." 7 U.S.C. § 7(d). The business judgment rule may provide a useful analogy, but it is not dispositive of the question presented.

nated as contract markets subject themselves to CFTC regulations, which provide that any emergency rule adopted, such as the one at issue here, must be "necessary or appropriate." [4]

■ Bad faith has been defined in analogous cases as "ulterior motive, for example, personal gain." *P.J. Taggares Co., Inc. v. New York Mercantile Exchange,* 476 F.Supp. 72 (S.D.N.Y.1979) (Weinfeld, J.), *citing Miller v. New York Produce Exchange,* 550 F.2d 762, 767 (2d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977) and *Daniel v. Board of Trade,* 164 F.2d 815, 819 (7th Cir.1947). Exchange actions motivated by ulterior motives such as personal gain are not consistent with the exchange's duty to prevent manipulation, nor are they in accord with the responsibility to protect the public interest, which, as noted in *P.J. Taggares, supra,* at 75, is a "primary function of an exchange."

Moreover, the Seventh Circuit's analysis of the importance of good faith in exchange action is right on target:

> "Because of the Board's relation to the public, it must ... act with utmost objectivity, impartiality, honesty, and good faith. It owes that duty not only because it is affected with the public interest, but because of the complete confidence reposed in it by its members, and the further fact that the directors ... of the Board ... may themselves be members of the market, and as such have to act where their own private interests are concerned."

*Daniel v. Board of Trade,* 164 F.2d 815, 819–20 (7th Cir.1947).[5]

■ In view of the exchange's duty to act with "utmost objectivity" in the public interest, we conclude that if an exchange enacted a rule for the *sole* purpose of advancing the private interests of its members, and if the rule damaged the plaintiff, it would not be a defense for the exchange to allege that the rule was reasonable.

■ However, the question remains whether the allegation that the Governors enacted the rule "in order to derive direct financial benefits and to advance their own individual and/or corporate 'interests'" (Complaint ¶ 33) is sufficient to state a claim. The answer, at least in the circumstances of this case, must be in the negative, because that allegation is consistent with the possibility that the Governors acted to advance the public interest, as well as to advance their own interests. Such behavior would not be actionable.

Careful refinement of the pleadings is particularly important in this case because the Comex Board is composed of members of the commodities industry, who are called upon, on occasion, to vote on matters which, by the nature of the situation, relate to the industry from which a Governor derives his livelihood. A vote on such questions will then quite likely affect his interests as well as the public's. Should a Governor vote in favor of such a rule in the belief that the rule served the public interest, even if also in the expectation and hope that it would serve his personal interest, his behavior would not give rise to liability.

Accordingly, Bishop's allegation of bad faith (Complaint ¶ 33) is insufficiently precise to permit a ruling as to whether it states a claim under the principles set forth above. Bishop may, within ten days, file an amended pleading in accordance with the instant ruling if he can do so in good faith.[6]

4. The regulations provide:
   "A temporary emergency rule may ... authorize the contract market ... to undertake actions necessary or appropriate to meet the emergency ..."
   17 C.F.R. 1.41(f)(3).

5. In *Daniel,* the Seventh Circuit found that a cause of action was stated by a trader who alleged that the members of the Chicago Board of Trade had enacted certain regulations "for their own personal gain" and in order to protect themselves against liability in an antitrust action which had been filed against them. *Id.,* 164 F.2d at 818.

6. Defendants' remaining contentions concerning the specificity of the complaint are without merit. Whether analyzed under the principles of Rule 9(b) or Rule 8 (a point disputed by the parties) it is unnecessary for a plaintiff in an action of this nature to allege the extent of each defendant's interest in silver futures or the nature of the interest (e.g. whether "he was supposedly voting to advance his ... employer's interest, his own self interest, or whatever oth-

## III. *The Martin Act*

Defendants argue that the CEA preempts New York's statute prohibiting fraud in commodities transactions, N.Y.Gen.Bus.Law § 352 *et seq.* ("the Martin Act"), because the regulatory scheme established by the Martin Act is "incompatible" with the regulatory scheme created by the CEA.

With respect to the authority of the states to *regulate* commodities, the CEA provides that CFTC jurisdiction is "exclusive" as to certain enumerated transactions, including "transactions involving contracts of sale of a commodity for future delivery." 7 U.S.C. § 2 (1982 Supp.). The statute further provides that the jurisdiction of state and federal "regulatory authorities" is not limited or superseded by the CEA except as to the enumerated transactions and that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." Thus, the statute appears on its face to deprive state "regulatory authorities" but not state courts of jurisdiction relating to commodities. However, it is fair to say that the language of the CEA is not entirely clear, and accordingly we turn to the legislative history.

The Senate Report on the CEA provision in question reflects a concern with the overlapping jurisdictions of various agencies, particularly the Department of Agriculture, which had been responsible for regulating commodities prior to the enactment of the 1974 CEA amendments, and the Securities and Exchange Commission, which had been entrusted with related regulatory authority. S.Rep.˙ No. 1131, 93rd Cong., 2d Sess. *reprinted in* 1974 U.S.Code Cong. & Ad.News 5843, 5861–5863. We have found nothing in the legislative history indicating Congressional concern that state statutes prohibiting fraud in commodities transactions (as opposed to regulation by federal and state agencies) would hinder uniform application of the CEA.

The report of the House-Senate Conference Committee supports the conclusion that Congress intended CFTC jurisdiction to be exclusive only as regulatory agencies, state or federal, but not as to state courts. Under the heading "Jurisdiction of the Commission," the Conference Report explains that the Senate amendments, which were adopted by the Conference, provide that:

> the Commission's jurisdiction, where applicable, supersedes State as well as Federal *agencies*; ... Federal and State *courts* retain their respective jurisdictions."

er interest may be involved." Governors' Brief at 41). Nor is it necessary for Bishop to set forth, in his complaint, the identities of the individuals who he believes assisted the Governors.

Nor is there any weight to Comex's argument that, as a non-profit corporation, it cannot act out of self-interest, or to the contention of all defendants that the votes of the self-interested directors were not the cause of the enactment of the rule on the ground that the rule would have passed by the votes of the disinterested directors had the interested directors not voted. Comex's novel argument, which is not supported by any authority, is unpersuasive because a corporation, whether for profit or not-for-profit, may have interests other than profit-making. The absence of a profit motive does not require the conclusion that a corporation cannot act in its own interest.

Moreover, all corporations, whether or not profit-making, act through the actions of their boards of directors. Absent exceptional circumstances, such an act is, by definition, an act of the corporation, and, if it is illegal, the corporation is liable for the consequences. *See Daniel v. Board of Trade, supra,* at 820. Comex has cited no authority indicating that non-profit corporations are exempt from such general principles, nor is any known to the Court. This ruling does not prevent Comex from attempting to prove, on a proper record, that such exceptional circumstances are presented in this case.

Defendants' contention that the rule would have passed without the votes of the Governors who then had an interest in silver may be an appropriate point for judgment on the merits; it requires little discussion on a motion directed at the pleadings. Bishop, has alleged that the defendants' bad faith caused the enactment of the rule; if defendants wish to secure a judgment dismissing the claim, they may move for summary judgment, supported by affidavits by individuals having personal knowledge of the facts, not, as they have done on the instant motion, by unsworn statements at oral argument and in their memorandum of law.

Conf.Rep. No. 1383, 93rd Cong., 2d Sess. *reprinted in* 1974 U.S.Code Cong. & Ad. News 5897 (emphasis added).

Several judicial decisions have dealt with the analogous question whether the grant of exclusive jurisdiction to the CFTC preempts federal criminal antifraud statutes. In ruling that the grant of jurisdiction to the CFTC excluded agency regulation only, the court in *United States v. Abrahams,* 493 F.Supp. 296 (S.D.N.Y.1980), reviewed the CEA legislative history, concluding:

> "Where the Commission's jurisdiction was made 'exclusive,' the jurisdiction of other federal agencies ... and of the state agencies, was preempted so that '[t]he potential for a hodgepodge of regulatory requirements ...' would be avoided. * * * The legislative history makes clear that Congress intended the Commission to exercise sole jurisdiction over the *regulation* of futures contracts. * * * [T]he Act did not preempt the *states* from enforcing their general antifraud statutes."

*Id.* at 301–302, *quoting* Johnson, The Commodity Futures Trading Commission Act: Preemption as Public Policy, 29 Vanderbilt L.Rev. 1, 5 (1976) (emphasis in original). *See also United States v. Brien,* 617 F.2d 299, 310 (1st Cir.1980) ("While courts have held that the CFTA preempts state regulation of commodities futures ... it has also been held that the CFTA does not preempt state general antifraud statutes"); *United States v. Shareef,* 634 F.2d 679 (2d Cir. 1980).

■ Where, as here, the statutory language is not specific on the point, it is appropriate to apply the general rule that "[p]re-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained.'" *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981), *quoting Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). It cannot reasonably be argued that Congress has "unmistakenly ordained"

that the state statutes creating private rights of action for commodities regulation are to be preempted by the CEA. Immediately after granting the CFTC a limited exclusive jurisdiction, the statute provides that "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." In view of this statutory language, amplified by the legislative history and the analogous case law, we conclude that the statute is intended to preempt state and federal agency regulation of commodities only, while preserving those state rights of action which are adjudicated in state courts.

Nor does the "nature of the regulated subject matter permit[ ] no other conclusion" than preemption. In the absence of any indication to the contrary in the legislative history, there is no reason to conclude that Congress would have opposed the additional deterrent to manipulation to be found in the exercise in state courts of state conferred rights.

■ The defendants argue, as a fallback proposition, that the Martin Act is distinguishable from other state court actions because it authorizes the New York Attorney General to investigate and otherwise "regulate" commodities trading. However, it is unnecessary to determine whether investigation of exchange activities by the New York Attorney General is preempted by the CEA: the present action is brought by a private plaintiff. There is no indication that the State of New York seeks to intervene or to investigate the events in question. The fact that a statute provides for state regulation in addition to a private right of action does not taint the statute as to the private rights of action, which we have found are not preempted by the CEA. *See Strax v. Commodity Exchange, Inc.,* 524 F.Supp. 936, 941–42 (S.D.N.Y.1981) ("The mere fact that the New York attorney general is empowered to investigate and prosecute restraints of trade does not lead to the conclusion that the actions of his office would impede the CFTC or interfere with the execution of the mandate of the CEA to regulate commodity futures trad-

ing"); *Witzel v. Chartered Systems Corp.,* 490 F.Supp. 343, 347 (D.Minn.1980).

■■■ Finally, it must be determined whether the complaint states a claim under the Martin Act. Defendants contend that the complaint fails because it does not allege the traditional elements of fraud, including privity.

Defendants misread New York law. As interpreted by the highest court of the State, the Martin Act is intended

> "to prevent all kinds of fraud ... and to defeat all related schemes whereby the public is exploited, the terms 'fraud' and 'fraudulent practices' to be given a wide meaning so as to embrace all deceitful practices contrary to the plain rules of common honesty ..."

*People v. Lexington Sixty-First Associates,* 38 N.Y.2d 588, 595, 381 N.Y.S.2d 836, 840, 345 N.E.2d 307, 311 (1976) (Cooke, J.). Moreover, the Martin Act "should be liberally construed in order that its beneficent purpose may, so far as possible, be attained." *Id.* The acts alleged,[7] if proven, would, we believe, constitute "deceitful practices contrary to the plain rules of common honesty."

## IV. *Immunity*

The Governors contend that they are entitled to absolute or qualified immunity for their actions in enacting emergency rules because the enactment of such rules is a "legislative" function.

■■■ The Governors' assertion of absolute immunity is without merit. Such immunity is available only under the most limited circumstances: it has been denied to Cabinet officers, *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), state governors, *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and aides to the President of the United States, *Harlow v. Fitzgerald,* —

U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

Moreover, as the Governors themselves have repeatedly asserted, they are not government officials; they are engaged in a *self*-regulatory function. While they are "designated" and regulated by a federal agency, and required by law to serve in the public interest, they are not elected by the public, or appointed by elected officials, nor are they paid by public funds.[8]

Moreover, even if the precedents cited above did not control, the argument that the Governors' work is "legislative" is not sound. While it is true that the Governors enact rules which bind Comex members, such a power is also held by the boards of directors of all membership associations or corporations. We see no logical basis for conferring immunity on the Governors and not on the directors of other membership groups and we decline to broaden the grant of immunity in such a loose fashion or by such a dramatic extension of the doctrine. In any event, such a broad extension of the doctrine, whatever its merits, should be a legislative, not a judicial, act.

■■■ The question of the availability of qualified immunity for the Governors is academic in the circumstances of this case. The complaint is of rulemaking in bad faith: if the trier of fact is convinced that the Governors were not in bad faith, the Governors will prevail, whether under the doctrine of qualified immunity or on the merits. If the Governors did what they are alleged to have done, for the reasons alleged by Bishop, their actions were in bad faith, under either the "objective" or "subjective" good faith standards as articulated by the Supreme Court in *Harlow v. Fitzgerald, supra.*

\*  \*  \*  \*  \*  \*

---

**7.** The acts alleged to have violated the Martin Act are the same acts which allegedly violated the CEA. (Complaint ¶¶ 42–44).

**8.** The only precedent cited by the Governors for the proposition that absolute immunity may be granted to private parties is *Cahn v. International Ladies Garment Union,* 311 F.2d 113 (3d

Cir.1962), in which the Third Circuit accorded absolute immunity to arbitrators. It is unnecessary to consider whether *Cahn* is persuasive precedent in light of more recent Supreme Court cases cited above: it suffices to note that the role played by arbitrators is distinguishable (and perhaps unique) in that it is quasi-judicial.

*Conclusion*

The motions to dismiss under Rule 12(b)(6) are denied. The motions to dismiss under Rule 9(b) are denied on the condition that Bishop amend his complaint within ten days from the date of this decision in accordance with the rulings above.

It is so ordered.