742 F.Supp. 843 (1990)
Gerald GROSSMAN, d/b/a Commodity Traders Weather Service, the Joint Trading Account of Gerald Grossman and Arthur Blumenfeld  Rosenthal Segregated Account, Arthur Blumenfeld, Milton Taylor, Andrew Weiss, Ann Schlanger, and Frank Baltakis, On Their Own Behalf and On Behalf of All Persons Similarly Situated, Plaintiffs,
v.
CITRUS ASSOCIATES OF THE NEW YORK COTTON EXCHANGE, INC., Defendant.
No. 87 Civ. 8117 (CSH).
United States District Court, S.D. New York.
July 20, 1990.
*844 Charles J. Hecht, P.C., New York City (Charles J. Hecht, of counsel), for plaintiffs.
Mound, Cotton & Wollan, New York City (Michael R. Koblenz, Constantino P. Suriano and Mitchell S. Cohen, of counsel), for defendant.

MEMORANDUM OPINION AND ORDER
HAIGHT, District Judge:
This case is now before the Court on defendant's motion to dismiss pursuant to *845 Fed.R.Civ.P. 12(b)(6) and 9(b) and for sanctions pursuant to Rule 11.

Background
Familiarity with the background of the captioned litigation and this Court's prior Opinions in the case is assumed, but a summary is useful here.

Factual Background
Plaintiff Gerald Grossman, d/b/a Commodity Traders Weather Service[1] was at all times relevant to this litigation a commodities trading advisor. In short, Grossman "was at all relevant times engaged in the business of managing and investing customer funds on a discretionary basis in the commodities markets." Second Amended Complaint at ¶ 5. Grossman specializes in the Frozen Concentrate Orange Juice ("FCOJ") contract market. Id.
Grossman took short positions in the FCOJ market on behalf of himself and his clients over the period December 12, 1985 through December 17, 1985 on which he lost money. It is that financial loss which is at the heart of the present litigation.
FCOJ futures contracts are regularly traded on the Citrus Associates of the New York Cotton Exchange, Inc. ("Citrus Exchange"). A single FCOJ contract "consists of 15,000 pounds of frozen concentrate orange juice." Id. at ¶ 34. An upward move of 100 points in respect of a FCOJ contract represents a profit of $100 on that contract and a downward move of 100 points similarly represents a $100 loss on the contract. Id. at ¶ 35.
Plaintiffs allege that on any given trading day, the limit on FCOJ trading is a price change of 500 points in either direction from the prior day's closing price. Id. at ¶ 36. Thus, there is a potential 1,000 point spread allowable on any particular day, namely 500 points up and down from the closing mark of the day before. Plaintiffs contend that the FCOJ market has historically been quite stable.
In terms of the factors which influence the price of FCOJ contracts, plaintiffs identify the following "four major ongoing fundamental statistics which affect the price of FCOJ futures contracts" on "information and belief":
(i) the weather and temperatures in Florida, particularly in the months of December, January and February and especially U.S. government computer forecasts, as to whether there will be a winter "freeze" in Florida;
(ii) the first of the month, FCOJ cold storage stocks in Florida;
(iii) the average price and quantities of Brazilian imported FCOJ; and
(iv) the weekly movement of FCOJ from the processors and distributors to the wholesale grocers, supermarkets, etc.
Id. at ¶ 45. In terms of the relative importance of these factors, plaintiffs contend that "[t]he single most important factor affecting the price of FCOJ futures contracts in December is the weather and, more particularly, whether there will be any major winter freeze in Florida, i.e., a low temperature of at least 24 [degrees] Fahrenheit in the orange producing areas." Id. at ¶ 46.
Weather forecasters use meteorological data issued by the National Meteorological Center ("NMC"), a government agency, in formulating their weather predictions. The NMC issues weather data from two basic computer models, the first of which is the LFM computer guidance model ("LFM model"). The LFM model produces atmospheric flow patterns at twelve hour intervals. Id. at ¶ 48. Subsumed within the figures derived from the LFM model is a "set of computer produced temperatures." Id. at ¶ 49. These computer generated temperatures, known as "Klein temperatures," consist of "high and low temperatures for each major weather station at 12 hour intervals going out to 60 hours from the time of data collection." Id. Plaintiffs contend that the Klein temperatures are "quite accurate" and cannot generally be *846 improved upon by human weather forecasters. Id. From this plaintiffs conclude that it is "rare for the human forecaster to make more than a 5-8 degree change to the[] [Klein] temperatures." Id.
There is a second computer generated model relied upon by meteorologists known as the "spectral model." The spectral model yields longer range predictions "going out to 180 hours from the time of data collection." Id. at ¶ 50. The spectral model is less reliable than the LFM model and is generally used to create three to seven day forecasts which are modified as data from the LFM model becomes available.
During the relevant trading period, December 12, 1985 through December 17, 1985, the trading volume in the FCOJ market was heavy and the price changes extensive. Grossman attributes that situation to certain weather reports which erroneously predicted a freeze in southern Florida. These weather reports are at the center of the instant lawsuit and some factual detail as to those reports is necessary here.
Grossman himself is a meteorologist. Id. at ¶ 32. During the period from December 9, 1985 through December 13, 1985, there were some forecasts "of a possible freeze over the weekend of December 14 and 15." Id. at ¶ 55. Perhaps in response to these forecasts, the market rose 265 points on December 13, 1985. Id. at ¶ 56. The predicted freeze over the December fourteenth weekend did not materialize as temperatures remained above twenty-four degrees Fahrenheit. Id. at ¶ 58.
Plaintiffs allege that on December 16, 1985 at approximately 10:00 a.m., Grossman received a new LFM which, in his view, indicated that there would not be a freeze over the coming days. Grossman believed that in possession of this new weather information, traders would adjust their buying patterns accordingly and "the markets would logically back off, since it was already greatly extended by unsubstantiated freeze rumors." Id. at ¶ 60. Despite Grossman's predictions for a decline in the price of FCOJ contracts, "on December 16, 1985, the market continued to accelerate upward and closed up the price limit." Id. at ¶ 61.
Plaintiffs further allege that at approximately 10:00 p.m. on December 16, 1985, an updated LFM package was released by the NMC which "was again emphatic in showing no chance of a freeze." Id. at ¶ 65. As of 10:00 p.m. on Monday, December 16, 1985, Klein temperatures for Thursday morning, December 19, 1985 became available. The Klein temperature forecast for Orlando, Florida for December 19, 1985 was forty-eight degrees Fahrenheit. The weather data from the spectral model also became available during the evening of December 16, 1985. That data "had a somewhat colder looking atmospheric flow pattern than the LFM," which in plaintiffs' view warranted modifying the Klein temperatures down not more than five degrees.
During this period of time some private weather forecasting operations were predicting a freeze in the orange belt. Plaintiffs point specifically to a single firm, Freese-Notis, a former defendant in this action in whose favor I granted summary judgment in respect of the first amended complaint.[2] Prior to the December 13, 1985 weekend, at which time Grossman heard talk of a weekend freeze, "Freese-Notis was predicting mild temperatures for the orange belt." Grossman v. Citrus Assoc. of the N.Y. Cotton Exch., 706 F.Supp. 221, 235 (S.D.N.Y.1989). Freese-Notis issued a weather report to its customers on December 16, 1985 "indicating their opinion that a `damaging freeze was quite possible'" on Thursday, December 19, 1985. Id. At the time that Freese-Notis was predicting a late week freeze, several other weather firms were predicting similarly inclement weather. Id. On the morning of Tuesday, December 17, 1985, the morning after the Klein temperatures for Thursday had become available, Freese-Notis issued a new forecast "predict[ing] mild temperatures *847 for Thursday." Id. Freese-Notis' Tuesday morning forecast "indicated that colder temperatures might move in over the weekend, but stated that the situation was not as clear-cut as it had earlier appeared and further monitoring of the situation was warranted." Id.
Plaintiffs contend that the weather outlook for the subject time period was artificially dire, which resulted in unduly inflated prices on FCOJ contracts. Grossman was short FCOJ contracts from December 12, 1985 through December 17, 1985 over which time the price of the contracts rose. Hearing rumors of a freeze, William Mallers, the president of First American Discount Corporation ("First American"),[3] both former defendants in this action, called Grossman on December 16, 1985. Mallers "demanded enough margin to cover two limit days beginning Tuesday morning [the morning of December 17, 1985]. Mallers further stated that even with this additional margin he would take off half of the Joint Account's position on the opening on Tuesday if the market opened above Monday's close." Second Amended Complaint at ¶ 62. The market did open up on Tuesday, December 17, 1985, and as he said he would Mallers liquidated fourteen of the twenty-eight short positions held by the joint account with First American. Id. at ¶ 75. The liquidation of these contracts occurred between 10:15 a.m. and 10:22 a.m. Id. at ¶ 41.
On December 17, 1985 at approximately 10:22 a.m., just after the liquidation of fourteen of the First American contracts, Grossman put on stop limits between 130.10 and 130.50 on all of his as well as his client's remaining accounts. Id. at ¶ 41. The majority of the orders were filled at 131.65. Id. The buying in of these remaining shorts was the result of a conversation which Grossman had with Frank Pusateri, the sole shareholder in Frank S. Pusateri Associates, Inc. ("Associates"),[4] both former defendants in this action, in which Pusateri "demanded"[5] that Grossman cover 23 of the 46 contracts which Grossman was short on the Europe and Overseas Traders, S.A. ("EOT") account.[6] On December 17, 1985, after the start of trading, Pusateri called Grossman and "demanded" that he cover the remaining shorts held for EOT. Grossman did. 706 F.Supp. at 226.
As a result of covering his short positions at prices higher than that at which he sold the contracts, Grossman lost his own money as well as that invested on behalf of his clients. It is this financial loss which constitutes the damages for which plaintiffs now sue.

Procedural History

1. First Amended Complaint
The first amended complaint in the captioned action, served as of right pursuant to Rule 15(a) before the filing of a responsive pleading by any of the defendants named in the complaint, named seven defendants. Specifically, plaintiffs brought suit against the Citrus Exchange, Pusateri, Associates, Futures Asset Management, *848 Inc. ("Futures Asset"), Mallers, First American, Freese-Notis and John and Jane Doe for alleged violations of the Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. (the "Act"). The first amended complaint alleged two separate claims against the various defendants. The first cause of action alleged "[u]pon information and belief, Associates, [Futures Asset], Pusateri, Freese-Notis, First American, Mallers and defendants `John Doe' and `Jane Doe,' substantially assisted in the scheme to defraud and manipulate the price of FCOJ contracts and the commodities underlying such contracts." Amended Complaint at ¶ 95 (emphasis added). Although the amended complaint was unclear on the point, it appeared as if the fraud and manipulation claim was brought pursuant to Section 4b, 7 U.S.C. § 6b, the general anti-fraud provision of the Act, and Section 5a, 7 U.S.C. § 7a.
The second cause of action alleged that the defendants conspired with one another to the financial disadvantage of the plaintiffs. Specifically, the complaint alleged "[u]pon information and belief, during the period of December 13 through December 17, 1985 and prior thereto, all defendants named herein entered into a conspiracy pursuant to which they intended to defraud the class members and improperly manipulate the market prices of FCOJ contracts and/or the commodities underlying such contracts." Amended Complaint at ¶ 103 (emphasis added).
Freese-Notis moved for summary judgment in respect of the allegations against it in the first amended complaint and the remaining defendants moved to dismiss for varying reasons. By Opinion published at 706 F.Supp. 221, I granted defendants' motions in their entirety. As to Freese-Notis, judgment was entered in its favor on February 17, 1989 dismissing the case as to it in its entirety with prejudice and without leave to replead.
The first cause of action was dismissed for failure to state a claim as to defendants Pusateri, Associates, Futures Asset and John and Jane Doe without prejudice and with leave to replead. Inasmuch as the first cause of action alleged that the Citrus Exchange had "willfully aided, abetted, counseled, induced, and procured" the commission of a violation of the Act, it was dismissed with prejudice and without leave to replead for failure to state a claim. To the extent the first cause of action asserted any other claims against the Citrus Exchange they were dismissed without prejudice and with leave to replead.
The first amended complaint was dismissed in its entirety as to Mallers and First American on the grounds of improper venue.
As to the second cause of action, it was dismissed without prejudice and with leave to replead for failure to state a claim as to defendants Citrus Exchange, Pusateri, Associates, Futures Asset and John and Jane Doe.
Plaintiffs were given forty-five days from the date of the prior Opinion dismissing the complaint to "file a second amended complaint as to defendants Citrus Exchange, Pusateri, Associates, Futures Asset, `John Doe' and `Jane Doe' ... if so advised after counsel's consideration of the obligations imposed by Rule 11." 706 F.Supp. at 236.
Plaintiffs later moved for reconsideration of that part of this Court's February 7, 1989 which granted defendant Freese-Notis' motion for summary judgment. By Opinion dated May 9, 1989, I denied plaintiffs' motion for reconsideration. Grossman v. Citrus Assoc. of the N.Y. Cotton Exch., No. 87-8117, slip op. at 5, 1989 WL 51825 (S.D.N.Y. May 10, 1989).

2. Second Amended Complaint
Plaintiffs filed a second amended complaint in the case on March 30, 1989. Only the Citrus Exchange is named as a defendant in the second amended complaint although reference is made in portions of the complaint to certain of the former defendants in the case.
While the complaint does not have a section in which its sets forth the cause(s) of action against the Citrus Exchange, it does, in that part of the document labeled "The *849 Parties," contend that the conduct of the Citrus Exchange during the subject time period was in violation of 7 U.S.C. §§ 7a(8), 25(b)(1)(A) and (C). The essence of the conduct of which plaintiffs complain is the failure of the Citrus Exchange to suspend trading in FCOJ contracts and its subsequent alleged failure to conduct an investigation into the trading atmosphere of which plaintiffs complain.

Discussion
The Citrus Exchange is both a board of trade[7] and a licensed contract market and as such is subject to the reporting and recordkeeping requirements of the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 7(a) and (b). Plaintiffs maintain that the Citrus Exchange is a division of the New York Cotton Exchange ("NYCE") and is therefore subject to NYCE regulations. The Citrus Exchange argues vehemently that it is not a division of the NYCE, but rather is a wholly separate entity not subject to NYCE regulations but only to Citrus Exchange regulations. There appears to be support for both positions although clearly only one is correct. Without discovery, and none has been taken at this stage of the proceedings, it is not possible to make a determination as to the relationship between the two exchanges. I therefore turn to an examination of each of the rules which plaintiffs claim have been violated.

I. Exchange Regulations and By-Laws

A. NYCE By-Laws
The NYCE by-laws, appended as Exhibit A to the second amended complaint, do not on their face appear to apply to the instant defendant. The NYCE by-laws define their scope as follows:
The By-Laws and Rules which follow deal with, among other things, contracts in futures, options on futures, and options on physicals for which the New York Cotton Exchange ("Exchange") has been designated as a contract market by the Commodity Futures Trading commission ("Designated Contract") as well as certain spot contract transactions ("Spot Contracts") authorized by the Exchange. The Secretary of the Exchange shall cause to be published, form time to time, a listing of such Designated Contracts and Spot Contracts, together with the defined terms used to refer to such contracts throughout the By-Laws and Rules.
NYCE By-Laws Section 1.00. Also under Section 1.00, which delineates the scope of the by-laws generally, is the Secretary's listing of the designated and spot contracts on the Exchange. The listing is as follows:
1) Cotton Futures # 2 ("Cotton Contracts" or "Cotton");
2) Options on Cotton Futures # 2 ("Cotton Options Contracts", "Cotton Options" or "Options")
3) Liquefied Propane Gas Futures ("LPG Contracts", "LPG" or "Petroleum Futures");
FINANCIAL CONTRACTS
4) U.S. Dollar Index Futuressm ("Dollar Index", "Dollar Index Futures Contracts", "Dollar Index Futures", or "USDX®")
5) U.S. Dollar IndexsmOptions ("Dollar Index Options", "USDX® Options", "FINEX® Options", or "Financial Options")
6) European Currency Unit Futuressm ("ECU Futures Contracts" or "ECU Futures").
7) Five Year U.S. Treasury Note Futures ("FYTRsm Futures")
Additionally, the Exchange Rules provide for Spot Transactions in Cotton (Rule 4.01-4.04) and LPG (Rule 4.01-A).
FCOJ contracts are nowhere included in the list of futures traded on the NYCE, suggesting that they are not and that the Citrus Exchange, where FCOJ contracts *850 are traded, is not subject to NYCE by-laws. Indeed, plaintiffs themselves are equivocal on the issue alleging defendant's obligation to comply with NYCE by-laws on "information and belief." Second Amended Complaint at ¶ 19. Before instituting litigation, plaintiffs must at least be certain that defendant is subject to the regulations which they contend have been violated. Plaintiffs are not certain and the text of the by-laws which they cite suggests that their "belief" is ill-founded.

B. Citrus Exchange By-Laws
The Citrus Exchange has its own by-laws to which it is clearly subject. Plaintiffs have appended portions of those by-laws to the second amended complaint as Exhibit B. The portion of the by-laws relevant to the instant lawsuit is that covering "Emergency Action." Section 1.45 of the Citrus Exchange by-laws provides as follows:
(a) The Exchange shall have power to take action in an emergency as set forth in this section.
(b) Definition of Emergency
As used in this section the term "emergency" means:
(1) Any occurrence or circumstance specifically defined as an emergency in a By-Law or Rule of the Exchange which has been approved by the Commodity Futures Trading Commission.
(2) Any occurrence or circumstance which, in the opinion of a governing body of the Exchange, as defined herein, requires immediate action and threatens or may threaten such things as the fair and orderly trading in, or the liquidation of, or delivery pursuant to, any contract traded on the Exchange. Occurrences and circumstances which a governing body of the Exchange, as defined herein, may deem emergencies, include, but are not limited to, those occurrences or circumstance which are set forth in the Regulations of the Commodity Futures Trading Commission which define an emergency.
Citrus Exchange By-Laws Section 1.45(a) and (b).
When, in the opinion of the governing body as defined in the by-laws, an emergency situation is in existence, the governing body may take various options as follows:
(1) Emergency action which may be taken under this section may provide for, or may authorize the Exchange or any Committee of the Exchange to undertake, actions necessary or appropriate to meet the emergency, including, but not limited to, such action as:
(A) Limiting trading to liquidation only in whole or in part.
(B) Limiting trading to liquidation only except for new sales by parties who have the commodity to deliver pursuant to said sales.
(C) Extending or shortening the time for the expiration or trading in any contract.
(D) Extending the time for delivery.
(E) Changing or adding of delivery points and/or the means of delivery.
(F) Ordering the liquidation of contracts and the fixing of a settlement price therefor.
(G) Ordering the reduction in positions for any or all members or for any or all customers of members.
(H) Ordering the transfer of contracts, and the money, securities and property securing such contracts, held on behalf of a customer by a member to any other member or members willing to assume such contracts or obligated to do so.
(I) Extending, limiting or changing the hours of trade.
(J) Suspending trading.
(K) Modifying or suspending any provision of the By-Laws, Rules, Regulations or resolutions of the Exchange.
Citrus Exchange By-Laws Section 1.45(e)(1)(A)-(K).

C. CFTC Regulations
The CFTC regulations, which defendant concedes are applicable to it, provide as follows:
(a) Each contract market shall use due diligence in maintaining a continuing affirmative action program to secure compliance *851 with the provisions of Sections 5, 5a, 5b, 6(a), 6b, 8a(7), 80a(9) and 8(c) of the Act, with the regulations implementing Section 4c(c) of the Act and with all of the contract market bylaws, rules, regulations and resolutions which such contract market is required by the Act to enforce. Such program shall include:
(1) Surveillance of market activity for indications of possible congestion or other market situations conducive to possible price distortion;
(2) Surveillance of trading practices on the floor of such contract market;
(3) Examination of the books and records kept by contract market members relating the other business of dealing in commodity futures, commodity options, and cash commodities, insofar as such business relates to their dealing on such contract market;
(4) Investigation of complaints received from customers or option customers concerning the handling of their accounts or orders;
(5) Investigation of all other alleged or apparent violation of such by laws, rules, regulations and resolutions;
(6) Such other surveillance, record examination and investigation as is necessary to enforce such bylaws, rules, regulations and resolutions; and
(7) A procedure which results in the taking of prompt, effective disciplinary action for any violation which is found to have been committed.
CFTC Regulation § 1.51(a)(1)-(7).
In short, plaintiffs argue that the defendant Citrus Exchange improperly failed to take emergency action in the form of suspending or limiting trading in FCOJ contracts and that such failure caused them monetary loss. I now turn to the standards which govern such claims.

II. Claims against Exchange Defendants

The Act provides a remedy against an exchange defendant, such as the Citrus Exchange, whose actions or non-actions cause another financial loss. 7 U.S.C. § 25(b)(1)(A)-(C).[8] In addition to the causation element, plaintiffs must plead bad faith by the Citrus Exchange in order to defeat the instant motion. 7 U.S.C. § 25(b)(4).[9]

A. Bad Faith
Defendant's primary argument in support of its motion is that the second amended complaint does not sufficiently allege bad faith.
The first amended complaint in this case sounded in theories of conspiracy and related claims grounded essentially in an agreement between the various defendants to manipulate the FCOJ market to their benefit. As to the Citrus Exchange, I dismissed the first amended complaint for failure to state a claim on account of plaintiffs' "total failure to connect, by sufficient allegations, the exchange or any member by knowledge or design with any alleged scheme." 706 F.Supp. at 230. Plaintiffs renew their claim against the Citrus Exchange alone in the instant complaint, this time charging *852 not conspiracy between the Citrus Exchange and the former defendants in the case, but rather a bad faith failure to regulate the FCOJ contracts market.
In evaluating bad faith allegations against an exchange for improper action or non-action, the Second Circuit has said that "when self-interest or other ulterior motive unrelated to proper regulatory concerns is alleged to constitute the sole or the dominant reason for the exchange action, a complaint is sufficient even though the action was not beyond the bounds of reason." Sam Wong & Son, Inc. v. New York Mercantile Exch., 735 F.2d 653, 677 (2d Cir. 1984). In articulating the above standard of bad faith, the court of appeals approved the reasoning of Judge Lasker in litigation which arose out of the manipulation of the silver futures contract market in the early 1980's. Id.
When faced with a complaint charging the Commodity Exchange with bad faith enactment of a "liquidation only rule," Judge Lasker dismissed a complaint which alleged that in enacting the rule the Governors did so "`[i]n order to derive direct financial benefits and to advance their own individual and/or corporate "interests."'" Bishop v. Commodity Exch., Inc., 564 F.Supp. 1557, 1559 (S.D.N.Y.1983). Judge Lasker held that the allegation of bad faith was insufficient "because [it] is consistent with the possibility that the Governors acted to advance the public interest, as well as to advance their own interests." Id. at 1562. The pleading deficiency is of practical importance because "[s]hould a Governor vote in favor of such a rule in the belief that the rule served the public interest, even if also in the expectation and hope that it would serve his personal interest, his behavior would not give rise to liability." Id. Bishop's complaint against the exchange was dismissed with leave to replead "if he [could] do so in good faith." Id.
Bishop did file an amended complaint in the action before Judge Lasker and the exchange again moved to dismiss for failure to state a claim. The amended complaint alleged as follows:
"The dominant and decisive motivation and intent of the defendants in enacting the Liquidation Only Rule and the dominant purpose and reason for the Liquidation Only Rule was to advance the defendants' individual and/or corporate self-interest and/or to derive direct personal gain, rather than to advance the public interest, all of which was in bad faith. By engaging in the aforementioned bad faith acts, the defendants acted inconsistent with, contrary to and in violation of their duty and responsibility to advance the public interest and to act with the utmost objectivity, impartiality, honesty and good faith."
Bishop v. Commodity Exch., Inc., 581 F.Supp. 1278, 1279 (S.D.N.Y.1984) (quoting amended complaint at ¶ 33). In denying the exchange defendant's motion to dismiss, Judge Lasker wrote as follows:
The deficiency of the original complaint was that it alleged only that the Governors had enacted the rule in order to advance their own interests, an allegation which left open the possibility that the furtherance of their own interest was merely incidental to their attempt to advance the public interest. The amended complaint, on the other hand, clearly alleges that the Governors' advancement of their own interests was the dominant, not merely the incidental, motivation for their actions. Such an allegation adequately states a cause of action.
Id. It is from this series of complaints in Bishop and the resultant rulings by Judge Lasker that the court of appeals derived the standard articulated in Sam Wong.
Modeling their complaint after that which ultimately withstood Rule 12(b)(6) scrutiny in Bishop, plaintiffs at bar allege that "[t]he sole or dominant reason for the failure of defendant, its Board of Directors and its Executive Committee to take necessary and appropriate emergency action under the these [sic] circumstances was to elevate its self-interest above proper regulatory concerns, thereby constituting bad faith for purposes of 7 U.S.C. § 25(b)(1)(A) [sic; should read 7 U.S.C. § 25(b)(4)]." Second Amended Complaint at ¶ 92. Of *853 course, it is not enough to parrot the legal allegations which proved sufficient on the facts as they were pled Bishop. Such conclusions must be supported by well-pleaded facts in the instant complaint.
At the heart of plaintiffs' complaint are the weather reports for the orange belt which came out during the December 12, 1985 through December 17, 1985 time period. It is common ground that there were those who were predicting a freeze for that period and the subsequent weekend. Plaintiffs concede, as they must, that their cause of action, to the extent it exists at all, arises out of the early morning events of December 17, 1985 when Grossman covered his own short positions as well as those he held on behalf of his clients. Id. at ¶ 27. The trading that morning was hectic and the price high, in response, plaintiffs contend, to reports of a possible weekend freeze. Plaintiffs argue that these reports were unrealistic and there was no chance of a weekend freeze. With the benefit of hindsight plaintiffs were proved right as the weekend came and went with no freeze in the orange belt. The fact remains, however, that certain reputable weather forecasters were predicting a freeze, giving traders in the market who agreed with those predictions cause to purchase FCOJ contracts, thereby driving the price of the contracts up.
In essence, plaintiffs contend that someone was intentionally driving up the price of FCOJ contracts and using a deliberately false freeze prediction as their vehicle. However, the Citrus Exchange is not a weather forecaster and while it is charged with monitoring those factors which influence the price of the futures contracts traded on the exchange, it is not responsible for making decisions as to which of conflicting weather reports is correct and which way the market should be moving. It is precisely the fact that traders disagree over components which go into a price determination that makes the market work. The fact that people disagree over which weather person is correct and what the state of other factors which influence the market may be is why some are buyers and some are sellers on any given trading day. It is not the function of an exchange to allow the market to function only when there is no disagreement amongst traders, nor is it the function of an exchange to determine the ultimate "truth" in respect of whether prices should rise or fall. That truth is determined by the interrelationship between the buyers and sellers in the market-place.
This is not a situation where the Citrus Exchange is alleged to have had anything to do with the publication of the allegedly false weather reports, and indeed the prior motion practice in the case suggests that plaintiffs could not sustain such an allegation were it made. Rather, this is a case where plaintiffs argue that the Citrus Exchange should have known that someone else was engaging in the intentional publication of false weather reports and that it should then have suspended trading on December 17, 1985, which would, in the plaintiffs' view, have prevented their losses.
However, the second amended complaint is fatally defective insofar as it alleges the very essence of plaintiffs' claim, namely "that the defendant knew or had reason to believe that there was a price distortion or manipulation since at least noon on December 16, 1985," second amended complaint at ¶ 94, on "information and belief." Id. Unless the Citrus Exchange know of a price manipulation or consciously avoided acquiring such knowledge, it was under no obligation to take any corrective action and its failure to do so cannot be said to have been in bad faith. Indeed, the Second Circuit has held that "[a] claim of bad faith must be supported by two allegations: first, that the exchange acted or failed to act with knowledge; and second, that the exchange's action or inaction was the result of an ulterior motive." Ryder Energy Distrib. v. Merrill Lynch Commod., 748 F.2d 774, 780 (2d Cir.1984) (citation omitted). The complaint at bar fails in its charge of bad faith because it does not sufficiently allege that the Citrus Exchange "failed to act with knowledge."[10]
*854 If the Citrus Exchange were itself in on a plan to elevate the price of FCOJ contracts by the publication of deliberately false weather reports, or the allowance of trading based on what it knew to be intentionally fraudulent reports, or if there was no explanation at all for the heavy market activity of December 17, 1985, plaintiffs might have a claim, but as it is they do not. In essence, the complaint as it now stands reflects the situation of numerous investors who played the game and lost; such loss is not actionable.
The second amended complaint is dismissed for failure to state a claim. In this situation where plaintiffs were given an opportunity to file a second amended pleading after extensive motion practice resulted in the dismissal of the first amended complaint, I will not grant leave to replead.

B. Causation
While it is not necessary to reach the issue of causation, having determined that the complaint is defective in respect of its bad faith allegations, I will write briefly on the point as I view it as a separate ground for dismissal of the second amended complaint.
As the allegations against the Citrus Exchange now stand, they speak in terms of failure to take emergency action on or about December 17, 1985. It is apparent from a reading of plaintiffs' complaint that what caused the bulk of their losses is a combination of Grossman's own decision to cover the short positions which he held and bad fills of those positions. Neither of those things can be attributed to the Citrus Exchange. The fact that Grossman did not have the courage of his convictions in respect of the weather and in what direction the FCOJ market would move is not the fault of the Citrus Exchange. If Grossman had stayed his ground and maintained his short positions in FCOJ contracts, he might well have made rather than lost money. Instead, he panicked and bought them in at very high prices, a decision about which he is now understandably unhappy. However, that is the risk one takes in playing the market.[11]

III. Rule 11 Sanctions

It follows from this analysis that, judged objectively there was no reasonable basis in fact or law to support the filing of a second amended complaint. Under Rule 11, I award Citrus Exchange $1,000 toward its attorney's fees in making this motion. My purpose is to deter, not to fully compensate. *855 That amount shall be paid by plaintiffs' counsel, not by plaintiffs.

Conclusion
The second amended complaint in this action is dismissed without leave to replead for failure to state a claim.[12]
The foregoing is SO ORDERED.
NOTES
[1] Grossman brings this suit on his behalf as well as on behalf of certain other named plaintiffs, clients for whom he invested money, and members of a class of similarly situated persons. The parties have stipulated that any motion for class certification will be made within sixty (60) days after a decision on the instant motion.
[2] Freese-Notis, an Iowa corporation, "is a private weather forecasting firm in the business of issuing weather reports to its customers for a fee." Grossman v. Citrus Assoc. of the N.Y. Cotton Exch., 706 F.Supp. 221, 233 (S.D.N.Y. 1989). Many of Freese-Notis' clients are "involved in businesses affected by the weather." Id.
[3] First American was a broker handling the joint trading account of Gerald Grossman and Arthur Blumenfeld. The joint account is a plaintiff in this action.
[4] Associates "was, during the relevant time period, in `the business of evaluating [commodity trading advisor's] services to futures commission merchants ... introducing brokers and account executives, and assisting [commodity trading advisors] in the preparation and distribution of their disclosure documents and other sales material." 706 F.Supp. at 225. Grossman entered into "an agreement with Associates, whereby Associates would introduce clients to Grossman and raise money for him to manage, in exchange for a percentage of Grossman's profits." Id.
[5] While plaintiffs have characterized Pusateri's requests as a demand, "Grossman was admittedly under no obligation to liquidate his position. The agreement between Grossman and Associates characterized trades made by Grossman on behalf of EOT as discretionary; Associates and Pusateri had no real power to direct Grossman's trading position." 706 F.Supp. at 226 n. 7 (citing Amended Complaint at ¶¶ 45, 48, 51, 57, 79). Rather, "Grossman acceded to Pusateri's `demands' because `he did not want to lose business which he received and might receive in the future from Pusateri.'" Id. at 226 (quoting Amended Complaint at ¶ 57).
[6] EOT was the single account which Pusateri introduced to Grossman pursuant to Grossman's agreement with Associates.
[7] 7 U.S.C. § 2 provides that a board of trade "shall be held to include and mean any exchange or association, whether incorporated or unincorporated, or persons who shall be engaged in the business of buying or selling commodity or receiving the same for sale on consignment."
[8] 7 U.S.C. § 25(b)(1) provides as follows:

(A) A contract market or clearing organization of a contract market that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce by section 7a(8) and (9) of this title, (B) a licensed board of trade that fails to enforce any bylaw, rule regulation, or resolution that it is required to enforce by the Commission, or (C) any contract market, clearing organization of a contract market, or licensed board of trade that in enforcing any such bylaw, rule, regulation, or resolution violates this chapter or any Commission rule, regulation, or order, shall be liable for actual damages sustained by a person who engaged in any transaction on or subject to the rules of such contract market or licensed board of trade to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaws, rules, regulations, or resolutions.
[9] 7 U.S.C. § 25(b)(4) provides as follows:

A person seeking to enforce liability under this section must establish that the contract market, licensed board of trade, clearing organization, registered futures association, officer, director, governor, committee member, or employee acted in bad faith in failing to take action or in taking such action as was taken, and that such failure or action caused the loss.
[10] While it is a close question, the second amended complaint does sufficiently allege ulterior motive, the first prong of bad faith. The second amended complaint at bar goes beyond the bad faith allegations addressed by the court in Apex Oil Co. v. Dimauro, 641 F.Supp. 1246 (S.D.N.Y.1986), aff'd in part and rev'd in part, 822 F.2d 246, 261 (2d Cir.), cert. denied, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987).

In Apex, plaintiffs alleged merely that the exchange failed to regulate trading in order to keep the market open, thereby avoiding a loss of investor confidence. The district court held that such an allegation does not rise to the level of bad faith contemplated by the Act because "[a]ction to preserve investor confidence is action to preserve the integrity of the marketplace and is in the public interest." 641 F.Supp. at 1279-80. The court of appeals explicitly approved the district court's reasoning on the point. 822 F.2d at 261.
Insofar as plaintiffs at bar allege merely an attempt by the Citrus Exchange to keep the FCOJ market open in order to increase the number of exchange members and increase the trading volume, that is akin to the investor confidence allegations in Apex and does not constitute ulterior motive. However, plaintiffs also contend that increased commission income goes to members of the defendant exchange who execute the trades. Second Amended Complaint at ¶ 91(b). Thus, increased trading volume leads to increased commissions. Non-action by the Citrus Exchange based solely on the financial benefits of increased trading volume would constitute bad faith. Of course, whether plaintiffs could prove that claim is another matter entirely. I merely hold that in the context of a motion directed toward the face of the pleading, the allegations of ulterior motive are sufficient.
[11] As to defendant's alleged failure to investigate plaintiffs' complaint, inasmuch as there was such a failure it adds nothing to the allegations. The supposed failure to investigate did not in and of itself cause plaintiffs' losses and it lends no evidentiary support to the claim of bad faith failure to take emergency action. Grossman, 706 F.Supp. at 229.
[12] I express no view as to the Rule 9(b) issues raised in defendant's motion.